560 S.E.2d 894

**Amey G. DYKEMA, as Personal Representative of the Estate of David Bruce Dykema, Appellant/Respondent,**

v.

**CAROLINA EMERGENCY PHYSICIANS, P.C., Greenville Hospital System, and Companion HealthCare Corporation, Defendants,**

**Of Whom Greenville Hospital System is Respondent/Appellant,**

**and Companion HealthCare Corporation is Respondent.**

No. 25424.

Supreme Court of South Carolina.

Heard Nov. 14, 2001.

Decided March 4, 2002.

D. Michael Parham and S. Blakely Smith, of Parham and Smith, of Greenville, for appellant/respondent.

G. Dewey Oxner, Jr. and Sally McMillan Purnell, of Haynsworth, Marion, McKay and Geurard, LLP, of Greenville, for respondent/appellant.

Frank H. Gibbes, III, Stephanie Holmes Burton and Matthew E. Cox, all of Gibbes Burton, LLC, of Greenville, for respondent Companion HealthCare Corporation.

Harold W. Jacobs and Susan Batten Lipscomb of Nexsen, Pruet, Jacobs and Pollard, LLP, of Columbia, for Amicus Curiae South Carolina State Budget and Control Board.

Justice WALLER:

This is a wrongful death action brought by Appellant/Respondent, Amey Dykema, on behalf of the estate of her deceased husband, David Dykema, who died on February 8, 1994, as a result of undiagnosed pulmonary emboli. The jury awarded Dykema $2 million actual damages against Respondent/Appellant Greenville Hospital System (GHS), and $500,000 punitive damages against Respondent Companion Health Care (Companion). The trial court granted Companion's motion for Judgment Notwithstanding the Verdict (JNOV) on the ground that the jury's failure to award actual damages against it precluded an award of punitive damages. The trial court held the statutory caps of the South Carolina Tort Claims Act, S.C.Code Ann. §§ 15–78–10 et seq., were inapplicable to this case, such that GHS was liable for the full $2 million verdict.[1] Dykema and GHS appeal.

## FACTS

In December 1993, 38–year–old David Dykema began having respiratory symptoms, cough and shortness of breath for which he was seen by his family physician, Dr. William King. After seeing Dr. King until January 1994 without improvement, he sought a second opinion from the Center for Family Medicine (Center), part of the Greenville Hospital System.[2]

---

1. The trial court also ruled that, in any event, GHS was liable for two "occurrences" of negligence such that Dykema was entitled to $1 million dollars for each. In light of our holding concerning the statutory caps, we need not address this ruling.

2. In late 1993, Mr. Dykema selected Companion HealthCare for his medical provider and selected the Center as his primary care provider.

Mr. Dykema went to the Center on Feb. 3, 1994, with complaints of a one and one-half month history of cough, shortness of breath, and tightness in the chest. He was seen that day by a third year medical student, Terry Gemas, and an attending faculty member, Cindy Pearman, M.D. Dr. Pearman prescribed antibiotics for persistent bronchitis and told Mr. Dykema to return in one week, or sooner if his condition worsened. In the early morning hours of Sunday, Feb. 6, 1994, Amey Dykema called the Center concerning her husband's worsening condition and was advised to take him to the hospital the next day. She brought him to the hospital at approximately 1:00 PM on February 6 and was seen by Dr. Connell, a medical resident and employee of GHS who was on call at the Center. Dr. Connell diagnosed viral bronchitis and advised Mr. Dykema to continue his antibiotics and keep his follow-up appointment at the Center on Feb. 8. The next morning, Monday, Feb. 7, Amey Dykema called the Center and spoke with a receptionist; she requested her husband be seen immediately due to his worsening condition. She was told there were no earlier appointments available and that she should keep the appointment on February 8. David Dykema died on the morning of Feb. 8, prior to his scheduled appointment. The cause of death was a progressive showering of pulmonari emboli, pieces of which moved to his lungs and caused a fatal blockage.

On Dec. 20, 1995, Amey Dykema instituted this wrongful death action against GHS, and Carolina Emergency Physicians; the complaint was subsequently amended to add Companion as a defendant. Trial was held in February 1999, and the jury returned a general verdict accompanied by special interrogatories, finding both GHS and Companion negligent.[3] The jury awarded Dykema $2 million actual damages. However, it apportioned 100% of the actual damages to GHS. Nonetheless, it awarded Dykema $500,000 punitive damages against Companion.[4]

---

3. Carolina Emergency Physicians was exonerated.

4. The jury also sent a note to the judge requesting that South Carolina HMO's advise members and prospective members who enroll with practices involved with teaching facilities that they may be seen and treated by residents.

The trial court granted Companion's motion for JNOV on the ground that the jury's failure to award actual damages against it precluded an award of punitive damages; the court denied GHS's post-trial motion to reduce the $2 million verdict, holding the statutory caps of the South Carolina Tort Claims Act were inapplicable to Dykema's claims.

## ISSUES

1. Did the trial court err in entering JNOV for Companion?

2. Did the court err in holding that the statutory caps of the South Carolina Tort Claims Act were inapplicable to this case?

## 1. JNOV

■ The trial court held the jury's failure to award actual damages against Companion mandated the grant of JNOV to Companion. We disagree. We find Companion's failure to object prior to discharge of the jury results in a waiver of the right to challenge the verdict.

Here, after the jury returned its verdict finding $500,000 punitive, and no actual, damages against Companion, all parties were given an opportunity to review the verdict forms. Companion specifically declined the trial judge's invitation to request additional findings or corrections by the jury to the verdict form. The jury was thereby discharged, and Companion filed its post-trial motion for JNOV on March 1, 1999, ten days after the verdict was returned.

■ The trial court correctly held punitive damages generally are not recoverable in the absence of proof of actual damages. *Limehouse v. Southern Ry. Co.*, 216 S.C. 424, 58 S.E.2d 685 (1950). However, the trial court erred in setting aside the verdict absent a timely objection. We decline to hold that a party may allow the jury to be discharged in the face of an obviously defective verdict, which could easily be corrected upon resubmission to the jury, in the hopes of gaining a reversal on appeal. Accordingly, we find Companion waited too late to voice its objection to the verdict.

This Court has repeatedly held that a party should not be permitted to sit idly by while a verdict erroneous in form is being returned and witness its receipt without objection and later, after the jury has been discharged, claim advantage of the error, thus invited by acquiescence. *See Deese v. Williams*, 237 S.C. 560, 118 S.E.2d 330 (1961). *See also Washington v. Whitaker*, 317 S.C. 108, 451 S.E.2d 894 (1995)(holding that party may not wait until JNOV to object to punitive damage award as this Court does not recognize a "plain error" rule); *Limehouse v. Southern Ry.*, 216 S.C. 424, 58 S.E.2d 685 (1950)(where verdict is objectionable as to form, party who desires to complain should call that fact to the Court's attention when the verdict is published. Otherwise, the right to do so is waived); *McAlister v. Thomas and Howard Co.*, 116 S.C. 319, 108 S.E. 94 (1921)(defect in the form of a verdict must be presented at the time it is published, and failure to do so waives the right to raise that matter later); *Bethea v. Western Union Telegraph*, 97 S.C. 385, 81 S.E. 675(1914) (irregularity of jury verdict awarding punitive but no actual damages must be called to the attention of the court at the earliest opportunity; otherwise it will be deemed to have been waived; waiting until jury separates and then urging irregularity as ground for new trial is too late).

These cases are consistent with our recent opinion in *Stevens v. Allen*, 342 S.C. 47, 536 S.E.2d 663 (2000), in which we held a verdict finding the defendant liable but awarding zero damages is inconsistent or incomplete and that, **when the issue is raised,** the matter should be resubmitted to the jury with instructions to either enter a verdict for the defendant or award some amount of damages. Accordingly, consistent with the wealth of authority in this state, we find Companion's failure to challenge the verdict upon being given an opportunity to do so results in a waiver.[5] Therefore, the grant of JNOV

---

5. GHS relies on three cases which reversed an award of punitive damages in which there was no finding of actual damages, without any indication that the issue was raised prior to the jury's discharge. *See Dowling v. Home Buyers Warranty Corp.*, 311 S.C. 233, 428 S.E.2d 709 (1993); *Cook v. Atlantic Coast Line R. Co.*, 183 S.C. 279, 190 S.E. 923 (1937); *Monroe v. Bankers Life and Casualty*, 232 S.C. 363, 102 S.E.2d 207 (1958). However, the mere fact that we addressed an issue on the merits where no procedural defect was raised does not obviate the need for a timely objection. *Cf. Breland v. Love Chevrolet, Inc.*, 339 S.C. 89,

to Companion is reversed, and the $500,000 punitive damage award is reinstated.

## 2. APPLICABILITY OF STATUTORY CAPS

■ The trial court ruled the statutory caps set forth in S.C.Code Ann. § 15–78–120(a)(3) & (4) were inapplicable to this case. We agree.

At the time this action arose in February 1994, S.C.Code Ann § 15–78–120[6] limited the tort liability of state agencies and employees as follows:

(1) Except as provided in Section 15–78–120(a)(3), no person shall recover in any action or claim brought hereunder a sum exceeding two hundred and fifty thousand dollars because of loss arising from a single occurrence regardless of the number of agencies or political subdivisions involved.

(2) Except as provided in Section 15–78–120(a)(4), the total sum recovered hereunder arising out of a single occurrence shall not exceed five hundred thousand dollars regardless of the number of agencies or political subdivisions or claims or actions involved.

(3) No person may recover in any action or claim brought hereunder against any governmental entity and caused by the tort of any licensed physician or dentist, employed by a governmental entity and acting within the scope of his profession, a sum exceeding one million dollars because of loss arising from a single occurrence regardless of the number of agencies or political subdivisions involved.

(4) The total sum recovered hereunder arising out of a single occurrence of liability of any governmental entity for any tort caused by any licensed physician or dentist, employed by a governmental entity and acting within the scope of his profession, may not exceed one million dollars regardless of the number of agencies or political subdivisions or claims or actions involved.

529 S.E.2d 11 (2000)(notwithstanding numerous prior opinions entertaining appeals on merits of change of venue orders, such orders are not immediately appealable).

6. These sections have since been amended and reenacted, increasing the statutory caps. 1997 Act No. 155, Part II, § 55.

In *Southeastern Freight Lines v. City of Hartsville*, 313 S.C. 466, 443 S.E.2d 395 (1994), we held the Legislature's adoption of the Uniform Contribution Among Joint Tortfeasor's Act [7] (Uniform Contribution Act) impliedly repealed the statutory tort claims cap set forth in section 15–78–120 (a)(1), which was adopted by the Legislature as part of the South Carolina Tort Claims Act in 1986.[8] Subsequent to *Southeastern*, the Legislature responded with 1994 Acts No. 497, Part II, Section 107, in which it held the provisions of section 15–78–120 (a)(1) were reenacted and made retroactive to April 5, 1988, the effective date of the Uniform Contribution Act.[9]

Two years later, in *Knoke v. S.C. Dep't of Parks, Recreation and Tourism*, 324 S.C. 136, 478 S.E.2d 256 (1996), we held that *Southeastern* (and our subsequent opinion in *McClain v. S.C. Dep't of Educ.*, 323 S.C. 132, 473 S.E.2d 799 (1996)) [10] applied as well to the $500,000 per occurrence cap set forth in section 15–78–120 (a)(2), such that the statutory cap was inapplicable to Knoke's claim, filed before July 1, 1994.

In 1997, the Legislature enacted 1997 Act No. 155, Part II, § 55, in which it reenacted section 15–78–120, *in toto*, and established higher limits of liability. The reenactment of section 15–78–120 states that it takes effect upon approval by the Governor [June 14, 1997] and "applies to claims or actions pending on that date or thereafter filed, except where final judgment has been entered before that date." 1997 Act No. 155, Part II, § 55(F). Most recently, however, in *Steinke v. S.C. Dep't of Labor, Licensing and Regulation*, 336 S.C. 373, 520 S.E.2d 142 (1999), we held that the Legislature's purported reenactment of the statutory caps in 1997 Act No. 155 could

---

7. The Uniform Contribution Act was enacted April 5, 1988 and subjected the state to unlimited pro rata tort liability.

8. The Court also found the joint contribution act inconsistent with section 15–78–100(C) providing for special verdict forms specifying the proportional liability of each joint tortfeasor.

9. Simultaneously, the Legislature enacted section 15–38–65 to provide that "The Uniform Contribution Among Tortfeasors Act shall not apply to governmental entities." This Act took effect July 1, 1994.

10. In *McClain*, the Court held that the implied repeal of the $250,000 cap applied to all claims filed before July 1, 1994, not only those in which both the Uniform Contribution Act and Tort Claims Act apply.

not, by the above language of subsection F, retroactively overrule this Court's interpretation of the statutes in *Southeastern*. Accordingly, we held the plaintiffs' recovery was not limited by the Tort Claims Act as their case was filed prior to the Legislature's 1994 reinstatement of the statutory caps set forth in § 15–78–120 (a)(1) (which were effective July 1, 1994, whereas plaintiffs had filed their claims in June 1994).

GHS contends the $1 million dollar caps of § 15–78–120(a) (3) & (4) have never been repealed and that, in any event, the caps were "impliedly reenacted" by 1994 Act No. 497, effective July 1, 1994 as to causes already filed, or that, at the latest, these caps were reinstated by 1997 Act No. 155, effective June 14, 1997 (and applying to claims or actions pending on that date). We disagree.

Initially, we agree with the trial court that under *Southeastern* and *Knoke*, the statutory caps set forth in 15–78–120(a)(3) & (4) were impliedly repealed by adoption of the Uniform Contribution Act. Given *Southeastern's* holding that the pro rata liability provisions of the Uniform Contribution Act are inconsistent with the liability limits in section (a)(1), and *Knoke's* subsequent recognition that the same reasoning applies to the limits in (a)(2), it is patent that the liability limits set forth in subsections (a)(3) & (a)(4) were likewise impliedly repealed by the Legislature's adoption of the Uniform Contribution Act in 1988. The question remains, however, whether the limits were subsequently reenacted.

GHS contends the limits in (a)(3) & (a)(4) were "impliedly" reenacted by 1994 Act. No. 497. We disagree. The 1994 Act simply reenacted the statutory caps set forth in section 15–78–120 (a)(1) (and purported to make them retroactive to April, 1988, something this Court held the Legislature was without authority to do in *Steinke*); the 1994 Act did nothing to reenact the remaining subsections. Accordingly, the trial court correctly ruled the statutory caps as set forth in subsections (3) & (4) were not reenacted by the 1994 Act.

However, by 1997 Act No. 155, Part II, § 55, the Legislature reenacted all four subsections, and made the act applicable to all claims pending its effective date [June 14, 1997].[11]

---

11. Dykema's action, filed December 1995, was pending in June 1997.

While this provision was sufficient to reenact the liability caps of subsections 3 & 4, the question remains whether the Legislature could make the reenactment applicable to claims then pending, such as Dykema's. Under *Steinke*, we hold it could not.

As noted previously, *Steinke* held that the Legislature could not retroactively overrule this Court's interpretation of the statutes in *Southeastern*, but that it could prospectively reinstate such caps. Here, had the Legislature chosen to, it could have reenacted all four subsections in 1994. However, it reenacted only 15–78–120 **(a)(1)** in 1994. 1994 Act No. 497. Although this Court has not previously specifically held subsections (3) & (4) were impliedly repealed, it is patent under *Southeastern* and *Knoke* that they were in fact impliedly repealed and have been so since adoption of the Uniform Contribution Act in 1988. Although 1997 Act No. 155 was sufficient to **reenact** the remaining subsections, under *Steinke*,[12] such reenactment could not be made **retroactive,** and therefore took effect upon approval by the Governor on June 14, 1997. Accordingly, as Dykema's claim was filed in 1995, the trial court properly ruled the statutory caps set forth in subsection 3 & 4 do not apply in this case.

## CONCLUSION

The grant of JNOV to Companion is reversed and the $500,000 punitive damage award reinstated. The trial court's ruling that the statutory caps are inapplicable to this case is affirmed.

**AFFIRMED IN PART; REVERSED IN PART.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.

---

12. GHS contends *Steinke* is inapplicable because no prior opinion of this Court has held the caps of § 15–78–120 **(a)(3) & (4)** invalid. We disagree. *Southeastern* and *Knoke* implicitly hold those sections were impliedly repealed by the Legislature's adoption of the Uniform Contribution Act in 1988.