600 S.E.2d 88

**Ryan CAMDEN, Respondent,**

**v.**

**Jeannie HILTON, Appellant.**

**No. 3820.**

Court of Appeals of South Carolina.

Heard May 13, 2004.
Decided June 7, 2004.
Rehearing Denied Aug. 18, 2004.

Andrew F. Lindemann, of Columbia, and Lake Eric Summers, of Lexington, for Appellant.

Gaines W. Smith and James A. Stuckey, Jr., both of Charleston, for Respondent.

ANDERSON, J.:

Ryan Camden ("Respondent") commenced this action against former Goose Creek City Police Officer, Jeannie Hil-

ton, ("Appellant") for false imprisonment and violation of his Fourth Amendment rights. After the jury returned a verdict for Respondent on the false imprisonment claim and a verdict for Appellant on the 42 U.S.C. § 1983 claim, the trial court reformed the § 1983 verdict in Respondent's favor. Appellant appeals this ruling. We reverse.

## FACTUAL/PROCEDURAL BACKGROUND

On July 31, 1998, a robbery occurred at the First Federal Bank in Goose Creek, South Carolina. Many law enforcement agencies responded to the robbery, including the Goose Creek Police Department, the Berkeley County Sheriff's Department, the Charleston County Sheriff's Department, and the Federal Bureau of Investigation (FBI).

At or near the time law enforcement agencies were reacting to the bank robbery, Respondent began walking down College Park Road, located in close proximity to the bank. Deputy Jerry Wright of the Berkeley County Sheriff's Department pulled up behind Respondent and motioned him towards his car. Deputy Wright asked Respondent if he would accompany him for the purpose of answering some inquiries, as Respondent matched the general description of a robbery suspect who had been involved in a car chase with another Berkeley County deputy. Respondent agreed, and he was taken to the mobile command post set up by the various law enforcement agencies involved in investigating the robbery. Respondent professed he was handcuffed prior to being transported to the mobile command post and that he remained cuffed for the majority of his time there.

Upon arrival at the command post, Respondent testified he was introduced to Sheriff Dewitt who asked him again if he would agree to being queried. Respondent agreed, and Sheriff Dewitt questioned Respondent about the bank robbery and his automobile, a 1992 Honda Accord. Respondent averred that earlier in the day he loaned his car to two of his friends so that they could use it to get air in their car tire.

Following the questioning, Sheriff Dewitt asked Appellant to stand up and make a full turn so witnesses from the bank could see him and determine whether he was one of the people involved. Because none of the witnesses identified Respon-

dent as one of the perpetrators, Sheriff Dewitt removed the handcuffs from Respondent, thanked him for his cooperation, and told him he was "free to go."

In connection with his release from custody, Sheriff Dewitt instructed Deputy Wright that Respondent was cleared of involvement in the bank robbery and to return him to where he was found. Sheriff Dewitt further informed Deputy Wright that he was to protect Respondent's identity from the various media organizations gathering at the command post.

Before Deputy Wright could carry out these instructions, Captain Yvonne Turner of the Goose Creek Police Department instructed Appellant to have Respondent transported to the Goose Creek Police Station. Captain Turner was the top-ranking official from the Goose Creek Police Department at the command post. Captain Turner ordered Respondent's detention because she was told the FBI wanted to question him further. In compliance with this order, Appellant asked another Goose Creek police officer to assist her in transporting Respondent to the police station. According to Appellant's testimony, the other officer's assistance was needed because she was driving an unmarked patrol car and it was police department policy to transport suspects in marked patrol cars if possible. After placing handcuffs back on Respondent, Appellant placed Respondent in the rear of the second officer's car.

Both cars left the command post with Appellant's vehicle in the lead position. According to Respondent, when his car arrived at the police station, Appellant "kept going." Appellant professed she did not see Respondent again after they left the command post.

Respondent declared he arrived at the police station at approximately 1:30 p.m. He was taken out of the patrol car by two policemen who led him through the station and into a small, windowless room, designated as the "Breathalyzer room," a room commonly used for testing persons charged with driving under the influence. Within a few minutes after being placed in the room, an FBI agent questioned Respondent for about five minutes. He remained handcuffed and alone in this room for the next several hours.

After Appellant had been in this room for three or four hours, Detective Merrithew entered. Respondent asked the detective to find out what was going to happen to him. Detective Merrithew told Respondent a Berkeley County deputy was coming to transport him and the two individuals who borrowed his car earlier in the day. When the Berkeley County deputy arrived, however, he informed Detective Merrithew that he was not looking for Respondent and Respondent should have been sent home.

Detective Merrithew told Respondent he would discern what was occurring and about fifteen minutes later, he returned to the room, apologized, and removed Respondent's handcuffs. Detective Merrithew then gave Respondent a ride home around 7:00 p.m.

Respondent commenced this action averring violation of his civil rights under 42 U.S.C. § 1983, as well as a state law claim of false imprisonment. The common law false imprisonment and the § 1983 action were submitted to the jury. The jury returned a defense verdict on the § 1983 claim. The jury awarded Respondent $3000 actual damages and $3000 punitive damages on the false imprisonment claim.

After the verdicts had been returned and the jury discharged, Respondent moved "to have the verdict conformed to grant [Respondent] judgment on the Section 1983 action." The motion was based on the fact that the jury awarded punitive damages on the state law claim, and concomitantly, all of the elements for recovery under § 1983 had been satisfied.

The trial court granted Respondent's motion because it found the elements for each cause of action were identical and the verdict on the state law claim supported a finding for Respondent on both causes of action. Appellant filed a motion to reconsider, which was denied.

## ISSUES

I. Did Respondent waive his right to raise alleged inconsistencies in the verdicts by not objecting prior to the discharge of the jury?

II. Did the trial court improperly weigh the evidence, thereby invading the province of the jury, when it placed greater emphasis on one verdict over the other?

III. Did the trial court err in reconciling the verdicts when Respondent failed to move for a new trial?

IV. Is Appellant entitled to attorney's fees under 42 U.S.C. § 1983?

V. Did the trial court err in concluding the two verdicts were inconsistent and could not be reconciled as returned by the jury?

## *LAW/ANALYSIS*

### I. Waiver

■ Appellant argues Respondent waived his right to raise any alleged inconsistencies in the two verdicts because Respondent did not object until after the jury was discharged.

The rule that parties seeking to reform a verdict must voice their objection before the jury is discharged has been followed in South Carolina since at least 1920. *See, e.g., Rhame v. City of Sumter,* 113 S.C. 151, 154, 101 S.E. 832, 833 (1920), *overruled on other grounds by Rourk v. Selvey,* 252 S.C. 25, 164 S.E.2d 909 (1968) ("The defendant's counsel made no attempt to find out what the jury intended, and their objections come too late. It was [counsel's] business to clarify and ask for a correction and reformation of the verdict before the jury were [sic] discharged.").

In *Dykema v. Carolina Emergency Physicians, P.C.,* 348 S.C. 549, 560 S.E.2d 894 (2002), our supreme court reaffirmed this principle. In *Dykema,* a wrongful death action against a hospital and medical provider, the jury awarded plaintiff $2,000,000 in actual damages against the hospital and $500,000 in damages against the medical provider. *Id.* at 552, 560 S.E.2d at 895. The trial court granted the medical provider's request for JNOV, reasoning that the failure of the jury to award actual damages precluded it from awarding punitive damages. *Id.*

In finding the trial court erred in granting the medical provider's motion for JNOV, the supreme court noted, "[t]his court has repeatedly held that a party should not be permitted

to sit idly by while a verdict erroneous in form is being returned and witness its receipt without objection and later, after the jury has been discharged, claim advantage of the error, thus invited by acquiescence." *Id.* at 554, 560 S.E.2d at 896 (citations omitted).

We find the trial court erred in entertaining Respondent's post-trial motion, as the motion was not presented to the court prior to the jury being discharged.

## II. Improper Weighing of Evidence

■ Appellant alleges that by favoring one verdict over the other, the trial court improperly weighed the evidence and thereby invaded the province of the jury. Specifically, Appellant asserts the trial court erred "in concluding that the intent of the jury could be ascertained from the verdict in favor of the Respondent on the state law claim. It is just as possible that the jury's actual intent was consistent with the defense verdict on the federal constitutional claim." We agree.

In *Vinson v. Hartley*, 324 S.C. 389, 477 S.E.2d 715 (Ct.App. 1996), this court examined when it would be appropriate for a trial court to reform a jury verdict:

A trial court may amend a verdict in matters of form, but not of substance. A change of substance is a change affecting the jury's underlying decision, but a change in form is one which merely corrects a technical error made by the jury. The judge cannot, under the guise of amending the verdict, invade the province of the jury or substitute his verdict for theirs. After the amendment, the verdict must be not what the judge thinks it ought to have been, but what the jury intended it to be.

*Vinson,* 324 S.C. at 406, 477 S.E.2d at 724 (citing 75B Am. Jur.2d *Trial* § 1886 (1992)).

While a trial judge may have the right in certain instances in a civil case to make, or order made, a correction in the verdict of a jury, after discharge of the jury, for the purpose of giving effect to what the jury unmistakably found, that power is limited strictly to cases where the jury has expressed their finding in an informal manner but the Judge cannot, under the power of amending the verdict, invade the province of the jury or substitute his verdict for theirs.

*Lorick Lowrance, Inc. v. Julius H. Walker Co.,* 153 S.C. 309, 319, 150 S.E. 789, 792 (1929) (citations and quotations omitted). "The law rather forbids this court assuming to take upon itself the powers, duties, rights, and privileges of a jury." *Anderson v. Aetna Cas. Sur. Co.,* 175 S.C. 254, 282, 178 S.E. 819, 829 (1934). "Obviously, the absolute power to change or modify the findings of a jury upon an issue of fact properly submitted to them would, when exercised, amount to the substitution of the trial judges findings for the verdict of the jury and to the abrogation in such cases of the right of trial by jury." *Id.* at 283, 178 S.E. at 830.

In the current case, the judge decided that because the jury found punitive damages on the state law false imprisonment claim, all of the elements underlying the federal claim were met. Accordingly, the trial court reformed the § 1983 verdict in Respondent's favor. Essentially, the court ruled that because the elements for both causes of action were, in its opinion, the same, the verdicts were inconsistent. However, it is not for the trial court to say what it thinks the verdict should be. We find the trial court improperly gave preference to one verdict over the other and by so doing improvidently invaded the province of the jury. We rule the trial court erred in reforming the § 1983 verdict in Respondent's favor.

### III. New Trial

Alternatively, Appellant claims the trial court erred in granting Respondent's motion to reform the verdict because Respondent failed to move for a new trial. Along with articulating when a trial court should reform a verdict, in *Vinson,* this court clearly stated "[a] party seeking amendment of a verdict must lay a proper foundation by a motion for a new trial." *Vinson,* 324 at 407, 477 S.E.2d at 724 (citing *Anderson v. Aetna Cas. & Sur. Co.,* 175 S.C. 254, 178 S.E. 819 (1934)); *see Dowd v. Imperial Chrysler–Plymouth, Inc.,* 298 S.C. 439, 441, 381 S.E.2d 212, 213 (Ct.App.1989) (citing *New York Carpet World v. Houston,* 292 S.C. 101, 354 S.E.2d 924 (Ct.App.1987)). "Any question affecting the verdict should be raised by a motion for a new trial." *Vinson,* 324 S.C. at 407, 477 S.E.2d at 724.

"A jury's verdict should be upheld when possible to do so and to carry into effect what was clearly jury's inten-

tions. But when the verdict is so confused that it is not absolutely clear what was intended, the court should order a new trial." *Anderson,* 175 S.C. at 283–84, 178 S.E. at 830. A party that seeks an amendment to a verdict must make a motion for a new trial. *Id.* at 280, 178 S.E. at 829. "The authority of a circuit court judge to correct, modify, or interfere with the verdict of a jury in a case properly triable by jury is embraced in and limited to the power to grant new trials." *Id.* at 283–84, 178 S.E. at 829. "If in the estimate of the trial court, the verdict of the jury is wrong and erroneous, the court can avoid it only by setting it aside and granting a new trial." *Stone & Clamp, Gen. Contractors v. Holmes,* 217 S.C. 203, 207, 60 S.E.2d 231, 233 (1950).

We hold the trial court erred in reforming the § 1983 verdict, as Respondent did not lay the proper foundation by making a motion for a new trial.

## IV. Attorney's Fees

Appellant contends any error in reconciling the two verdicts is not harmless, as finding Appellant liable under 42 U.S.C. § 1983 subjects her to attorney's fees totaling over $40,000. In view of our reversal of the case, we decline to address the issue of attorney's fees under 42 U.S.C. § 1983.

## V. Inconsistency of the Verdicts

Appellant maintains the trial court erred in concluding the two verdicts were inconsistent as returned by the jury. We agree.

In South Carolina, an appellate court must uphold a jury verdict if it is possible to reconcile its various features. *Rhodes v. Winn–Dixie Greenville, Inc.,* 249 S.C. 526, 530, 155 S.E.2d 308, 310 (1967); *Dowd v. Imperial Chrysler–Plymouth, Inc.,* 298 S.C. 439, 441, 381 S.E.2d 212, 213 (Ct.App.1989). Furthermore, "a jury verdict should be upheld when it is possible to do so and carry into effect the jury's clear intention." *Johnson v. Parker,* 279 S.C. 132, 135, 303 S.E.2d 95, 97 (1983); *Joiner v. Bevier,* 155 S.C. 340, 350–53, 152 S.E. 652, 656 (1930); *Billups v. Leliuga,* 303 S.C. 36, 39, 398 S.E.2d 75, 76 (Ct.App.1990).

A priori, this court emphasizes that the claim posited by Respondent is a Fourth Amendment claim under 42 U.S.C. § 1983. In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the United States Supreme Court edifies:

This case requires us to decide what constitutional standard governs a free citizens claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. We hold that such claims are properly analyzed under the Fourth Amendments "objective reasonableness" standard, rather than under a substantive due process standard.

. . . .

A "seizure" triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen," *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968); *see Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989).

*Graham*, 490 U.S. at 388 and 395 n. 10, 109 S.Ct. at 1867–68 and 1871 n. 10, 104 L.Ed.2d at 450 and 455 n. 10.

The Fourth Circuit Court of Appeals in *Robles v. Prince George's County*, 302 F.3d 262 (4th Cir.2002) explicates:

We begin by considering Robles' federal constitutional claims. In order to make out a valid claim under 42 U.S.C.1983, Robles must show that (1) the actions of the police officers deprived him of an actual constitutional right and (2) that the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Only if both parts of this inquiry are satisfied can Robles overcome the defendants assertion of qualified immunity.

Robles contends that the PGC officers violated his constitutional right to be free from unreasonable seizures. He asserts that "[b]ecause there was no legitimate reason to handcuff [him] to a pole and abandon him, the manner of his seizure was unreasonable."

The Fourth Amendment "governs claims of excessive force during the course of an arrest, investigatory stop, or

other 'seizure' of a person." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir.1997) (en banc). However, this court has rejected any concept of a continuing seizure rule, noting that "the Fourth Amendment ... applies to the initial decision to detain an accused, not to the conditions of confinement after that decision has been made." *Id.* at 1163 (internal citations and punctuation omitted). Once the single act of detaining an individual has been accomplished, the Amendment ceases to apply. *Id.* Robles acknowledges that the police had probable cause for his arrest. The officers were acting on the basis of an outstanding warrant issued by Montgomery County which contained five charges against Robles stemming from a vehicular hit and run accident the previous year. Robles also admits that Rozar and DeBarros did not use excessive force when they took custody of him. The officers made clear the reason for his arrest, handcuffed him, and placed him in the back of a police cruiser without incident.

*Robles*, 302 F.3d at 268.

There are a number of logical reasons why the jury could have legitimately returned a verdict in Respondent's favor on the state law false imprisonment claim, but a verdict for Appellant on the federal claim. The jury could reasonably have determined Appellant was entitled to qualified or "good faith" immunity on the federal claim, as she was following a direct order from Captain Turner when she placed Appellant under arrest. The parties do not dispute that Captain Turner ordered Appellant to transport Respondent to the police station. The jury could have reasonably found Appellant liable on the state law false imprisonment claim because this claim does not recognize a good faith immunity defense.

42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that

in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

 To assert a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that (1) the actions of the police officers deprived him of an actual constitutional right and (2) the right was clearly established at the time of the alleged violation. *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818, 827 (1999). "[A] court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399, 405 (1999).

 "[T]he only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301, 309 (1991). "The doctrine of qualified immunity shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Rogers v. City of Amsterdam,* 303 F.3d 155, 158 (2d Cir.2002) (quoting *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999)); *accord Williams v. Goord,* 142 F.Supp.2d 416, 428 (2001). "This policy is justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Williams,* 142 F.Supp.2d at 428 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). If the plaintiff alleges "an arrest without probable cause, an arresting officer may assert the defense of qualified immunity if 'either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Rogers,* 303 F.3d at 158 (quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)). Because qualified immunity is an affirmative defense, the defendant bears the burden of proving the challenged act was objectively

reasonable in light of the existing law. *Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir.1997). The United States Supreme Court has held a clearly established statutory or constitutional right "must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3034, 97 L.Ed.2d at 531.

The qualified immunity defense has been recognized to extend to situations when a police officer is merely following the orders of a superior officer. In *Bilida v. McCleod*, 211 F.3d 166 (1st Cir.2000), the First Circuit Court of Appeals explained the concept: "Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances)." *Id.* at 174–175 (citations omitted); *see also Varrone*, 123 F.3d at 81 (finding that a prison official had qualified immunity for carrying out his supervisor's directive, even though he did not independently investigate the basis and reason for the order).

It is uncontested Appellant was instructed to transport Respondent to the police station by her superior, Captain Turner. Therefore, it is logical the jury felt Appellant was entitled to qualified immunity on the federal claim. The trial court did not refer to "qualified immunity" in its instructions to the jury. Rather, the court used the synonymous phrase "good faith." This is especially apparent when one considers the trial court's instruction on this issue:

> I charge you also that not every error of law or fact on the part of a police officer will subject her to liability under the Civil Rights Act. An arrest is often a stressful and unstable situation calling for discretion and evaluation by the police officer. Thus, an officer acting in good faith is not liable for the arrest even if it should be determined ... that the officer was in error. I further instruct you that is inevitable that law enforcement officials will in some cases

reasonably but mistakenly conclude that probable cause is present.

And we have—and in those types of cases, the official may not be held personally liable if you find, of course, the person acted in good faith. Because in such a situation, a plaintiff making an arrest, there is a defense of good faith and probable cause that *is available to them in a 1983 action.*

(emphasis added).

The jury could have logically found Appellant was entitled to the good faith defense on the federal cause of action, but not on the state law cause of action. We find the trial court erred in ruling the verdicts were inconsistent and subsequently reforming the § 1983 verdict in Respondent's favor.

### Punitive Damages/Qualified Immunity Defense

 Throughout his brief, Respondent repeatedly argues the trial court was correct in concluding the Appellant could not be subject to punitive damages and yet still be entitled to a qualified immunity (good faith) defense on the federal claim. This argument is based on the idea that to award punitive damages, it must be proved by clear and convincing evidence that Appellant acted "intentionally, willfully, wantonly, or recklessly." Because the jury found punitive damages, it must have believed Appellant acted willfully or recklessly. Thus, Appellant could not have acted in good faith under the federal claim. We disagree.

 A number of cases addressing the qualified immunity, or good faith defense, have squarely rejected the idea championed by Respondent. In *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759, (1998), the United States Supreme Court noted "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated." *Id.* at 588, 118 S.Ct. at 1592, 140 L.Ed.2d at 773; *see Ulichny v. Merton Cmty. Sch. Dist.,* 93 F.Supp.2d 1011, 1042 n. 21 (E.D.Wis.2000) (finding defense of qualified immunity may not be rebutted by evidence that defendant's conduct was malicious or otherwise improperly motivated); *Brown v. Ives,* 129 F.3d 209, 211 (1st Cir.1997) ("The test is objective; claims of malice do not

overcome qualified immunity."); *Williams v. Treen,* 671 F.2d 892, 896 (5th Cir.1982) ("Qualified immunity now depends on the objective reasonableness of an officials conduct, as measured by reference to clearly established law, not upon malice or other subjective factors."). "The subjective malice or bad faith of the official is irrelevant, and the only inquiry is whether a reasonable person could have believed his actions lawful at the time they were undertaken." *Leibowitz v. United States Dept. of Justice,* 729 F.Supp. 556, 561 (E.D.Mich.S.Div.1989). The qualified immunity "standard eliminates from consideration allegations about the official's subjective state of mind, such as bad faith or malicious intention, concentrating the inquiry upon the "objective reasonableness" of the official conduct. *Floyd v. Farrell,* 765 F.2d 1, 4 (1st Cir.1985). It is clear that even if Appellant did act in a manner sufficient to support an award of punitive damages on the false imprisonment claim, this does nothing to preempt a good faith defense on the federal claim. *See also Robles v. Prince George's County,* 302 F.3d 262 (4th Cir.2002) (finding defendants entitled to good faith defense, but nevertheless liable for actual and punitive damages under a state law claim). We reject the contention that a jury verdict awarding punitive damages preempts a good faith defense in a 42 U.S.C. § 1983 action.

## *CONCLUSION*

We rule the trial court erred because: (1) Respondent did not raise the "inconsistencies" in the verdicts until after the jury was discharged; (2) the court favored one verdict over the other and thereby invaded the province of the jury; (3) Respondent failed to move for a new trial; and (4) the verdicts as returned by the jury were necessarily inconsistent. Accordingly, the trial court's reformation of the § 1983 verdict is

**REVERSED.**[1]

HEARN, C.J., and BEATTY, J., concur.

---

1. The jury verdict on the common law false imprisonment claim in the amount of $3000 actual damages and $3000 punitive damages is not appealed and that verdict remains intact.