789 S.E.2d 71

**Claude W. GRAHAM, Respondent/Appellant,**

v.

**TOWN OF LATTA, SOUTH CAROLINA, Appellant/Respondent.**

and

**Vickie B. Graham, Respondent/Appellant,**

v.

**Town of Latta, South Carolina, Appellant/Respondent.**

Appellate Case No. 2013–000752.

No. 5398.

Court of Appeals of South Carolina.

Heard March 3, 2015.

Decided March 30, 2016.

Rehearing Denied Aug. 18, 2016.

---

166

Andrew F. Lindemann, Michael B. Wren, and Daniel C. Plyler, of Davidson & Lindemann, P.A., of Columbia, for appellants/respondents.

Reynolds Williams, of Willcox, Buyck & Williams, P.A., of Florence, for respondents/appellants.

McDONALD, J.

In this negligence action arising from a municipal sewer system overflow, the Town of Latta (the Town) appeals the circuit court's denial of its motions for directed verdict and judgment notwithstanding the verdict (JNOV). On cross-appeal, Claude Graham and Vickie Graham (collectively, the Grahams) argue the circuit court erred in (1) directing a verdict in favor of the Town on Vickie Graham's claims for inverse condemnation and trespass, and (2) ruling the Town has an easement by prescription for the sewer line located on their property. We affirm.

**FACTS/PROCEDURAL BACKGROUND**

On November 19, 2008, the Grahams filed companion civil actions [1] alleging that on September 5–6 and 13, 2008, the Town's municipal sewer system backed up, overflowed, and flooded their property at 220 East Rice Street in Latta.[2] Claude Graham asserted a negligence claim and Vickie Graham asserted claims for negligence, inverse condemnation, and trespass. In addition to their claims for damages to real and personal property, the Grahams alleged that they became physically ill as a result of the sewage backup events and their aftermath. The circuit court called the consolidated cases to trial on October 8, 2012.

At trial, Mr. Graham testified his wife purchased their home in 1989 for $60,000. The Grahams did not have the home inspected or the property surveyed before the purchase. Mrs. Graham testified that had she known there was a Town sewer line located under the property, she "would never have bought the house." Although the house was structurally sound when they purchased it, the Grahams spent a significant amount of time and money on renovations because the house was "in pretty bad shape." In addition to the money invested in the

---

1. These actions were later consolidated for discovery and trial.

2. On the nights of September 5th and 6th, 2008, Tropical Storm Hanna dumped more than seven inches of rain in the area, resulting in severe flooding.

house during the initial remodel in 1989, the Grahams spent $40,000 during a 2007 remodel.

Shortly after moving into the house, the Grahams began experiencing trouble with several toilets. Their plumber traced the problem to a stopped up sewer line in the backyard. The Town's director of public works at that time, Melvin Jackson, informed Mr. Graham that the main sewer line from another community runs across their property, under their house, and ties into the Town's main line on East Rice Street. At that time, the Town fixed the sewer line with a "repair strap" because it was leaking and causing a smell.

Following the sewage backup events of September 6, 2008, the Grahams spent a significant amount of time and money cleaning up their yard and crawl space, as well as replacing their heating and air conditioning (HVAC) system and ductwork. Mr. Graham consulted the Town's mayor and an official from the Town's sewer system. Mr. Graham testified that, according to the mayor, the Department of Health and Environmental Control (DHEC) had informed the Town that "the mixture of the water in the sewer system ... was contaminated[,] and that [it] was the Town's responsibility." Mr. Graham declined the Town's offer to retain a service to "pump the stuff out from under the house," because he "[d]idn't see any need for the Town to pay for what [he] was already doing."

Following another sewer overflow on September 13, 2008, ten to twelve inches of sewage collected under the Grahams' home, but "no water came into the house." Despite the Grahams' efforts to clean up the yard and underneath the house, foul odors remained in the Grahams' home and in their cars. After the September 13th overflow, the Grahams did not re-replace their HVAC system or the ductwork. Mr. Graham again reported the problem to the Town. On multiple occasions thereafter, the sewer line leaked and overflowed onto the Grahams' property and under their house. Upon their physician's recommendation, the Grahams moved out of the East Rice Street home in November 2008. Mr. Graham has consistently returned to the house for the limited purpose of mowing the yard, but he sees no reason to undertake

repairs until the Town corrects the underlying problem with the sewer line.

Following the September 2008 overflows, the Grahams and their dog "kept getting sick." They went "back and forth to the doctor and [took] the dog to the vet. . . . We were all on medication." Mrs. Graham was initially treated for respiratory problems and ultimately for pneumonia. After the Grahams moved out of the home, Mrs. Graham went back to the house occasionally to get some clothes and once in 2009 to use the copy machine. On that occasion, she had a respiratory reaction and was rushed to the emergency room. She has not since been back inside the house.

On cross-examination, Mrs. Graham testified she and her husband had not cleaned the pool or the storage room and the sewer line is still leaking under the house. Although Mrs. Graham had the water turned off two or three years ago, there is still sewage in the crawl space. Mrs. Graham suffered bouts of bronchitis and pneumonia prior to the sewage overflows, but she denied having any bronchitis issues once she stopped visiting the East Rice Street house in 2009.

Mrs. Graham explained that during this litigation, she received conflicting information as to whether the Town had an easement for the sewer line running beneath their property. The parties entered into evidence the following stipulation: "The parties stipulate that the Town of Latta is unable to produce a written instrument conveying an easement for a portion of the Town's sewer system which cross [sic] the property currently owned by Claude and Vickie Graham. 220 East Rice Street in Latta, South Carolina."

Dr. David Culpepper testified that the Grahams started coming to his practice in 2000. In the fall of 2008, he treated them "half a dozen" times each for "severe" respiratory tract symptoms and referred Mrs. Graham to "a specialist to check for allergies." When Dr. Culpepper learned about the sewage and mold in the Grahams' crawl space, he "encouraged them to seek other living quarters until the matter could be corrected." On cross-examination, Dr. Culpepper admitted the Grahams were treated for bronchitis prior to September 2008: Mrs. Graham was treated three times and Mr. Graham was treated five times. On re-direct, Dr. Culpepper opined as to

whether the Grahams' health conditions between 2000 and 2007 were connected in any way to their health conditions between October 2008 and May 2009:

> [I]t's common for patients to come in with ... occasional respiratory tract symptoms.... [T]here [is] a possibility there were leaks during that time period when there was rain and mold developing that they just weren't aware of[.] ... The difference is the intensity of the [symptoms and the] frequency of visits that began in 2008 with both patients experiencing symptoms.

Danielle Watson—a DHEC compliance officer for wastewater, stormwater, industrial water, and emergency response—testified that prior to September 2008, there were infiltration [3] problems with the Town's sewer system and several compliance issues regarding the Town's wastewater. Watson explained that following Tropical Storm Hanna, stormwater got into the sewer system, causing the lines to overflow. She observed debris from the sewer line located on the Grahams' property and either stormwater or wastewater under their house.

Watson testified it is the Town's responsibility to maintain, operate, and install the sewer line. She then testified that she informed the Town:

> A: [T]he area had to be cleaned up, and that usually when we clean up an area we add agricultural lime[,] which helps bring up the PH[,] which will help kill the bacteria and also cut down on the smell. All the solids had to be taken up and then lime the areas that were having overflows.
>
> . . . .
>
> Q: Okay. Did you discuss actions that could be taken to prevent such things from happening again in the future?
> A: Yes, sir. We actually had asked the Town to do some studies on the system to see where they were having problems with water getting into it.
> Q: And where [sic] those studies done to your knowledge?
> A: I know a smoke [testing] was done. Yes.

---

3. Infiltration occurs when groundwater gets into the sewage system. Conversely, exfiltration occurs when wastewater escapes from the sewage system.

Q: Have ... the problems that were identified been corrected to your satisfaction?

A: Some of them have, but not all of them that I know of.

On cross-examination, Watson agreed the Town has been responsive to DHEC's recommendations. She admitted that infiltration problems are "fairly common," and she has seen "quite a few" incidents where an overflow seeps under a house. Watson explained that DHEC maintains a list of contractors that pump water out from under houses as well as clean and sanitize such overflow. She also explained DHEC's "Recommendations for Sewer Clean-up in Residential Homes" form:

1. All furnishings, especially rugs, should be discarded. All non-porous surfaces which haven't been damaged by water should be washed down with a disinfectant solution.

2. For areas where water has fully penetrated the floors, the underlying floor insulation should be replaced. Even though the interior floor surface could be treated with a disinfection solution, the saturated insulation materials could pose a mold/mildew problem ... [and] adversely affect an individual's health.

3. Prior to doing any work within crawl spaces, it is suggested that the soil be treated with a disinfectant to reduce the risk of disease transmission.... The nature and extent of this treatment will depend on the amount of wastewater ... that could have entered the crawl space through the floor above.

4. Clean-up of the HVAC [depends] on the specific heating unit.... If wastewater intrusion has occurred, it is suggested that these ventilation ducts be removed and replaced.... [T]he entire duct system serving the first floor should be evaluated for evidence of wastewater[,] [and] [i]f necessary, they may need to be replaced. The coils under the home should also be checked to ensure that fecal matter has not gone down into this part of the heating unit. If found, the coils should be adequately disinfected.

Roger Davis, a mechanical engineer who has worked as a consulting engineer for the past thirteen years, was qualified

without objection as an expert in mechanical engineering. The circuit court further qualified Davis as an "environmental engineer in the field of waste disposal" over the Town's objection. Davis testified about the localized flooding from the passing tropical storm:

The flooding from the ditch adjacent to the Graham property. I think they call it the Main Town Ditch or something like that. It's kind of the main drainage channel for that area. Flooding from that ditch flooded the yard and surrounding streets around the Graham residence on that occasion.

But they also experienced release of sewage from the sewage system or sewage collector lines which ran across their property and underneath their house releasing the contents of the sewer line into this flooded area. There was also a release of sewage from the manholes in the street that were bubbling up through the flooded street at that time.

But there were also some other events which occurred both before and after that which involved the release of [sewage] from the collection system for the sewer in the Town of Latta. There was record [of] a number of complaints about those releases. There are some investigations that were done by the field investigator at D.H.E.C. documenting high levels of fecal chloroform bacteria in the ditches around the—[abutting] the Graham property.

Based on his review of the Town's records, "[i]ncluding some engineering work done by consultants on behalf of the Town ... to reroute that sewer line," Davis opined that the sewer line at issue passes under the Grahams' house. Davis explained that "it's very unusual to find a residence built over a sewer line" for two reasons: (1) any problem with the sewer line will affect the house; and (2) there is no good access for maintenance. The sewer line was likely constructed in 1924. Davis testified that sewer lines built during that time period were "most commonly" made out of terra cotta, which has a typical lifespan of fifty years.

Although he did not conduct any testing, based on his review of the Town's records, Davis determined there was a "significant amount" of infiltration and inflow. Unlike infiltra-

tion, which primarily involves ground water, inflow is typically surface water[4] or stormwater that enters the sewer system. Davis testified that inflow is "very obvious" while infiltration is "a little more gradual." Due to the Town's maintenance records indicating that it frequently has to blow out the sewer lines using a high powered hose, Davis opined "the problems created by that sewer line were largely in part due to excessive infiltration and inflow." He testified that if a sewer line leaks under a residence, there is contamination under the residence, which can lead to health problems, and "[t]he wet conditions, of course, can lead to things like mold and damage to the structure itself." Davis explained that the gases generated by sewage as it decays, principally hydrogen sulfide, can lead to asphyxiation and even death. He then discussed various options to relocate, replace, or repair the sewer line.

On cross-examination, Davis testified the only portion of the sewer line he has "laid eyes on" is the portion that runs across the drainage ditch. He further testified that this portion of the sewer line is made out of iron because, "[y]ou don't put terra cotta pipes across creeks." Davis admitted he did not use geographic information system (GIS) technology or global positioning system (GPS) technology to determine the location of the sewer line, nor did he run a camera through the sewer line. He further admitted that he is not entirely certain exactly where the sewer line is located. Davis explained that a service line, which runs from a home to a municipal sewer line, is the responsibility of the homeowner. On re-direct, Davis testified he saw evidence of the sewer leak in the manhole on East Rice Street.

John Benton, a licensed general contractor for thirty-eight years before retiring in 2010,[5] testified that he worked for an architect after graduating from high school and then for Kyle Construction. Benton opened his own construction company in 1973 and has focused on light commercial construction and custom homes since that time. He has built homes in Flor-

---

4. Surface water is the accumulated water from precipitation or underground sources not contained within a body of water. F.P. HUBBARD & R.L. FELIX, THE SOUTH CAROLINA LAW OF TORTS 229 (3rd ed.2004).

5. At the time of trial, Benton was employed by his brother's construction company.

ence, Marion, Myrtle Beach, Bennettsville, and Darlington. The Town objected to Benton's qualification as an expert in "estimating construction costs for custom homes in the Pee Dee," arguing his work in this case is not relevant as "[t]here has been no evidence ... that the house in question needs to be replaced." However, the circuit court qualified Benton as an expert in "estimating residential home building."

To complete his estimate, Benton obtained a copy of the Grahams' floor plans and visited the East Rice Street house on four separate occasions. Benton obtained prices from two different building supply companies. He estimated it would cost $478,280.56 to rebuild the Grahams' home, excluding the price of the property, landscaping, pool, and irrigation system. On cross-examination, Benton admitted his estimate included ten percent for his fee and ten percent for the use of his equipment, totaling almost $80,000. He also admitted he did not get any quotes from suppliers located in Dillon County. Benton testified he would not build a house without first surveying the property. He further testified he did not test or inspect the Grahams' home to determine whether it needs to be completely replaced.

At the close of the Grahams' case, the Town moved for a directed verdict as to all claims. The circuit court directed a verdict in favor of the Town on Mrs. Graham's claims for trespass and inverse condemnation and denied the motion as to both negligence claims. The circuit court also directed a verdict in favor of the Town regarding any claims arising out of the events that occurred on September 5–6, 2008.

The Town called its assistant supervisor, Willie Hooks, as its first witness. Hooks, who oversees the Town's water, sewer, and streets, went to the Grahams' home on September 6, 2008, where he witnessed "[a] lot of water on the road[,] ... water coming out of the ditch behind their home flooding their yard[,]" and "about [two]-inches of water" under their house. In order to determine the location of the sewer pipe, Hooks stood by the line that goes through the drainage ditch at the back of the Grahams' property while the Town's supervisor stood on the manhole on East Rice Street. "And by [their] assumptions of looking at each other from straight lines[,] it goes between [the Grahams'] pool and [their] home[,] [n]ot

under [their] home." Hooks testified that between May and October 2010, the Town smoke tested all of its manholes and sewer pipes. According to Hooks, no smoke came out from under or near the Grahams' home or any other home on East Rice Street during the testing.

Mike Hanna, a civil engineer with B.P. Barber Company and the Town's engineer since 1997, was qualified without objection as an expert in "civil engineering with a focus on wastewater." After September 6, 2008, Hanna was informed that the sewer line under the Grahams' house was leaking and sewage was pouring into their crawl space. Hanna looked at options to relocate the sewer line as he knew he could not replace a line underneath a house "but there were no good alternatives there."

In 2009, B.P. Barber performed a physical survey of all Town manholes to determine whether they were leaking. In 2010, B.P. Barber smoke tested the entire sewer system, paying particularly close attention to the area around the Grahams' house. The smoke testing did not reveal any problems or leaks in the vicinity of the Grahams' house. However, Hanna admitted that "[i]nfiltration is difficult to find using smoke testing. It's easier to find using camera surveys where you insert a camera in the line and go look for that drip." Because the results of the smoke test revealed there were "a number of problems," Hanna recommended that the Town "go to the next phase of testing[,] [which] is a camera survey." [6]

Based on the Federal Emergency Management Agency's (FEMA) map of Dillon County, Hanna opined that the Grahams' residence is located in a flood plain. Because maps of Dillon County created via aerial photos and GIS show every manhole as a green dot, Hanna explained that "[w]e can connect those dots to show the sewer system." He further explained that sewer lines are laid in straight lines. Red dots indicate where leaks were found in the sewer system, and red lines indicate the flood zones. Hanna identified the Grahams' residence and swimming pool and then testified "the sewer

6. At the time of trial, the Town was in the process of applying for funding to complete a camera survey, which would allow it to look at the sewer lines from the inside in order to identify cracked pipes, broken joints, and the like.

line goes right between the two." He later clarified that the sewer line is about three or four feet away from the house and "skirts the edge of the pool," opining that the sewer line does not go directly beneath the house.

On cross-examination, Hanna denied that camera tests were conducted on the sewer line at issue. Hanna admitted that the accuracy of the GPS devices used in creating the GIS maps is generally "within a foot [to] [eighteen] inches of the actual location." He also admitted he has a record indicating the Town searched for manholes it could not actually locate. However, he could not recall whether a manhole was missing from East Rice Street in front of the Grahams' driveway. Hanna also could not recall whether the missing manhole was covered up when East Rice Street was repaved.

Q: If in fact there was a manhole cover ... whose cover had been paved over at the end of the Grahams' driveway and ... [y]ou stood there with the G.P.S. device[,] [y]ou would draw a straight line right through their house, would you not?

A: If I knew that to be the case.....

. . .

Q: Will you agree with me that if the service line from the Graham house connects with the main line right at their back door within 5 or 6 feet of the carport. You know what area I'm talking about?

A: Yes, sir.

Q: Where the back steps join the grass, if there is a main line connection to the service line at that point would you agree with me that you can't get to [East] Rice Street from that point without going under their house?

A: That would be true.

The Grahams subsequently recalled Mr. Graham and Watson (of DHEC) as rebuttal witnesses. Mr. Graham testified he watched as his plumber dug up their service line and followed it to where it ties into the sewer line. He further testified the sewer line ran towards and then went underneath the house towards East Rice Street and the swimming pool has never had any sewage related issues. He then recalled another conversation he had with former public works director Jackson, in which Jackson told him that a manhole located off

the end of the Grahams' driveway had been covered up the last time East Rice Street was repaved.

Thereafter, Watson testified that after the flooding problems occurred—and after she became aware "of a line under a house"—she asked the Town to conduct a camera test on the sewer line at issue. The Town's supervisor reported to Watson that the Town had planned to come up behind the Grahams' house to get to the sewer line, but ran into an obstruction and could not get the camera to move over or forward. On cross-examination, Watson admitted she had not seen any photographs or reports from the testing. She also admitted she had no idea whether the sewer line at issue was leaking or not.

At the close of all the evidence, the Grahams moved for reconsideration of the directed verdict rulings, which the circuit court denied. Additionally, the Town renewed its motion for directed verdict, which the circuit court again denied. On October 11, 2012, the jury returned a verdict in favor of Vickie Graham in the amount of $225,000, and a verdict in favor of Claude Graham in the amount of $100,000. Thereafter, the Town filed a motion for JNOV and a motion for a new trial absolute. The circuit court denied these motions by order filed March 8, 2013.

**ISSUES ON APPEAL**

The Town raises the following issues on appeal:

I. Did the circuit court err in denying the Town's motions for directed verdict and JNOV pursuant to the discretionary immunity exception to the South Carolina Tort Claims Act?

II. Did the circuit court err in denying the Town's motions for directed verdict and JNOV by allowing the Grahams to rely on the doctrine of res ipsa loquitur?

III. Did the circuit court err in denying the Town's motions for directed verdict and JNOV with respect to Vickie Graham's claim for damages to real property? In the alternative, is the Town entitled to a new trial absolute due to Benton's testimony as to the replacement cost of the house in the absence of evidence that the house could not be repaired?

IV. Did the circuit court err in denying the Town's motions for directed verdict and JNOV with respect to Claude Graham's claim for damages to certain personal property? In the alternative, is the Town entitled to a new trial absolute because the jury should not have been permitted to consider losses to the personal property in the storage room?

The Grahams raise these issues on cross-appeal:

I. Did the circuit court err in directing a verdict in favor of the Town on Vickie Graham's claims for inverse condemnation and trespass?

II. Did the circuit court err in ruling the Town has an easement by prescription for the sewer line on the Grahams' property?

## LAW/ANALYSIS

"When ruling on motions for directed verdict and JNOV, the trial court and this [c]ourt must view the evidence and the inferences reasonably drawn therefrom in the light most favorable to the party opposing the motions." *Pike v. S.C. Dep't of Transp.*, 332 S.C. 605, 610, 506 S.E.2d 516, 518 (Ct.App.1998) *aff'd as modified,* 343 S.C. 224, 540 S.E.2d 87 (2000); *see also Strange v. S.C. Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 429, 445 S.E.2d 439, 440 (1994) (affirming denial of SCDOT's directed verdict motion where evidence viewed in light most favorable to plaintiff demonstrated that SCDOT did not weigh competing considerations or use accepted professional standards). This court must affirm a trial judge's denial of a directed verdict motion when there is evidence to support the ruling below. *Id.* Accordingly, we must review the evidence to determine whether the trial court properly submitted the case to the jury.

The circuit court may grant a new trial absolute when a jury awards excessive or inadequate damages. *Vinson v. Hartley,* 324 S.C. 389, 404, 477 S.E.2d 715, 723 (Ct.App. 1996). "The jury's determination of damages, however, is entitled to substantial deference. The trial judge must grant a new trial absolute if the amount of the verdict is grossly inadequate or excessive so as to shock the conscience of the court and clearly indicates the figure reached was the result of

passion, caprice, prejudice, partiality, corruption or some other improper motives." *Id.* The grant or denial of new trial motions rests within the sound discretion of the trial judge and her decision will not be disturbed on appeal unless the findings "are wholly unsupported by the evidence or the conclusions reached are controlled by error of law." *Id.* at 405, 477 S.E.2d at 723.

## I. South Carolina Tort Claims Act—Discretionary Immunity

 The Town contends the circuit court erred in denying its motions for directed verdict and JNOV based on the discretionary immunity exception to the South Carolina Tort Claims Act (Tort Claims Act). The Tort Claims Act "constitutes the exclusive remedy for any tort committed by an employee of a governmental entity." S.C.Code Ann. § 15–78–70(a) (2005). "The Tort Claims Act waives immunity for torts committed by the State, its political subdivisions, and governmental employees acting within the scope of their official duties." *Pike,* 343 S.C. at 230, 540 S.E.2d at 90. "The provisions of the Act establishing limitations on and exemptions to the liability of the State, its political subdivisions, and employees, while acting within the scope of official duty, must be liberally construed in favor of limiting [the] liability of the State." *Hawkins v. City of Greenville,* 358 S.C. 280, 292, 594 S.E.2d 557, 563 (Ct.App.2004).

Section 15–78–60 of the South Carolina Code sets forth forty exceptions to this waiver of immunity, including the discretionary immunity exception. *See* S.C.Code Ann. § 15–78–60 (2005 & Supp.2015). Section 15–78–60(5) provides that a "governmental entity is not liable for a loss resulting from: (5) the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." S.C.Code Ann. § 15–78–60(5) (2005). Our supreme court has repeatedly explained that "the burden of establishing a limitation on liability or an exception to the waiver of immunity is upon the governmental entity asserting it as an affirmative defense." *Pike,* 343 S.C. at 230, 540 S.E.2d at 90.

"To establish discretionary immunity, the governmental entity must prove that the governmental employees, faced with alternatives, actually weighed competing considerations and made a conscious choice." *Id.* "Furthermore, 'the governmental entity must show that in weighing the competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue before them. It is not enough to say the defect was noted and a decision was made not to repair it.'" *Id.* at 230, 540 S.E.2d at 90–91 (quoting *Foster v. S.C. Dep't of Highways & Pub. Transp.*, 306 S.C. 519, 525, 413 S.E.2d 31, 35 (1992)).

In denying the Town's motion for directed verdict, the circuit court explained that "in addition to the underlying dispute as to whether or not there is a leak[,]" there were four competing choices regarding the sewer line located on the Grahams' property: (1) reroute the line; (2) replace the line; (3) repair the line; and (4) do nothing.

The order denying the Town's motion for JNOV further elucidated the circuit court's reasoning:

Testimony was given at trial that [the Town] was presented with several choices to remedy the drainage problem: move the pipe, add a sleeve to insulate the pipe, fix any crack or leak with concrete or glue, or do nothing. Testimony was also presented that [the Town] conducted smoke tests to determine whether there was a defect, ... attempted to snake a camera through the line, then made a decision not to repair the pipe.

There was, however, no expert testimony indicating the Town actually weighed the competing considerations or that the Town utilized accepted professional standards in choosing to "do nothing." *See e.g., Pike,* 343 S.C. at 232, 540 S.E.2d at 91 (explaining that "[i]t is not enough to say the defect was noted and a decision was made not to repair it"). Significantly, the Town's expert engineer Hanna, was unaware a camera test had even been attempted—and abandoned when the camera encountered an obstruction in or around the line.

With respect to the camera testing, Watson explained the testers "were going to come up behind the house to get to the line, and once they got so far they had obstruction in the line. They couldn't get the camera over [the obstruction] or to go

any forward. So they couldn't get to that part to [l]ook at."
When asked about the nature of the obstruction, Watson noted
that the cameras can be stopped by a number of things. It
"could be solids. It could have been a rock. It could have
been a root." The obstruction could be inside the line or up
against it, causing the line to be pushed up such that "the
camera couldn't get over it." The record is unclear regarding
whether the Town kept a record or log of the camera test; no
such documentation was admitted into evidence.

The Town argues that in sending the case to the jury, the
circuit court disregarded this court's opinion in *Hawkins v.
City of Greenville,* which addressed a business owner's claims
that his flood damages were caused by the City's neglect in
designing and maintaining its stormwater drainage system.
*Id.* at 285–86, 594 S.E.2d at 560. In *Hawkins,* this court held
the Tort Claims Act barred plaintiff's claims because the
design and maintenance of a municipal stormwater system is a
discretionary governmental function requiring a city to exer-
cise measured policy judgments. *Id.* at 292–94, 594 S.E.2d at
563–64. Accordingly, the City of Greenville was "immune
from liability for [the] negligence claims arising out of the
design and maintenance of the drainage system in the Laurel
Creek Basin." *Id.* at 294, 594 S.E.2d at 564.

*Hawkins,* however, did not address the questions of wheth-
er the municipality actually weighed competing considerations
or utilized accepted professional standards in designing and
maintaining its stormwater drainage system. Instead, *Haw-
kins* focused, in pertinent part, upon the degree of discretion
granted to the City to "exercise the measured policy judg-
ments required to build and maintain an adequate municipal
sewer and drainage system in Greenville." *Id.* at 294, 594
S.E.2d at 564. To the extent measured policy judgments are
at issue, *Hawkins* would certainly control. The evidence
presented at this trial, however, demonstrates this is not the
situation in the case at bar.

The evidence in this case yields the reasonable inference
that the Town failed to utilize accepted professional standards
in addressing infiltration and inflow problems identified with
respect to its sewer line. The Town continues to challenge
whether or not the sewer line runs beneath the Grahams'

house, relying upon a "straight line" vision test from the drainage ditch to a selected manhole and a GPS survey that may or may not be missing a cemented-over manhole at the end of the Grahams' driveway. Following the smoke testing, which engineer Hanna admitted is not the preferred method for locating infiltration, Hanna recommended "go[ing] to the next phase of testing and that is a camera survey." It appears that Hanna was unaware a camera survey had already been attempted but that the camera encountered some unidentified obstruction. Without having gathered the information necessary to even attempt to address the identified infiltration and inflow problems, it would be difficult to determine as a matter of law that the Town had weighed the competing considerations necessary to address them. Thus, we find the circuit court properly denied the motions for directed verdict and JNOV based upon section 15–78–60(5).

## II. Res Ipsa Loquitur and Proximate Cause

■■■ Next, the Town argues the circuit court erred in denying its motions for directed verdict and JNOV by allowing the Grahams to rely on the doctrine of res ipsa loquitur to prove the sewer line located on their property was leaking or compromised in some fashion. We disagree.

■■■ To prevail in an action for negligence, a plaintiff must establish that: "(1) defendant owes a duty of care to the plaintiff, (2) defendant breached the duty by a negligent act or omission, (3) defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) plaintiff suffered an injury or damages." *Steinke v. S.C. Dep't of Labor, Licensing & Regulation,* 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999). "The absence of any one of these elements renders the cause of action insufficient." *Washington v. Lexington Cty. Jail,* 337 S.C. 400, 405, 523 S.E.2d 204, 206 (Ct.App.1999).

■■■ The Town correctly asserts that South Carolina does not recognize the doctrine of res ipsa loquitur. *See Crider v. Infinger Transp. Co.,* 248 S.C. 10, 16, 148 S.E.2d 732, 734–735 (1966) ("It is elementary that in order for a plaintiff to recover damages there must be proof, not only of injury, but also that it was caused by the actionable negligence of the defendant. It should be kept in mind that the doctrine of

[r]es ipsa loquitur does not apply."). In an action for negligence, the plaintiff must prove by direct or circumstantial evidence that the defendant did not exercise reasonable care. *Snow v. City of Columbia,* 305 S.C. 544, 553–55, 409 S.E.2d 797, 803–04 (Ct.App.1991). "Proximate cause is normally a question of fact for determination by the jury, and may be proved by direct or circumstantial evidence." *Player v. Thompson,* 259 S.C. 600, 606, 193 S.E.2d 531, 533 (1972). "The touchstone of proximate cause is foreseeability which is determined by looking to the natural and probable consequences of the defendant's conduct." *Gause v. Smithers,* 403 S.C. 140, 150, 742 S.E.2d 644, 649 (2013).

While it is true that no party was able to pinpoint the precise location of the compromised line beneath the Grahams' home, the Grahams presented more than the mere fact of damage to their real and personal property in support of their negligence claims. *See Snow,* 305 S.C. at 555–556, 409 S.E.2d at 803–804 (reversing the trial court's grant of directed verdict for the defendant on negligence claim as competing inferences might reasonably be drawn as to the city's failure to exercise due care in installation and maintenance of water main). Specifically, Davis's testimony regarding his review of the Town records discussing the system's infiltration and inflow issues, the age of the terra cotta pipes, and his observations of the sewage "bubbling" from the manhole near the Grahams' yard provided evidence of more than "the mere fact of damage." More telling, perhaps, was Watson's testimony about the sewer system's infiltration problems and the unidentified obstruction encountered when a camera test was attempted on the line running beneath the Graham property. Finally, the Town's inability to precisely locate its own sewer line—much less reach it in order to properly maintain it—certainly supports the inference that the Town failed to exercise due care in the operation and maintenance of its system. This evidence, in addition to Mr. Graham's personal observations, supports the circuit court's denial of the Town's motions for directed verdict and JNOV.

## III. Damages to Real Property

██ The Town argues the circuit court erred in denying its motions for directed verdict and JNOV with respect to

Mrs. Graham's claim for damages to real property. In the alternative, the Town argues it is entitled to a new trial absolute because the jury should not have been permitted to consider Benton's testimony regarding the cost to rebuild or replace the house without evidence that the house was permanently and totally damaged.

 "To recover damages [for negligence], the evidence must enable the jury to determine the amount of damages with reasonable certainty or accuracy." *Pope v. Heritage Cmtys., Inc.*, 395 S.C. 404, 434, 717 S.E.2d 765, 781 (Ct.App.2011). "The existence, causation, and amount of damages cannot be left to conjecture, guess, or speculation." *Id.* "However, proof with mathematical certainty of the amount of loss or damage is not required." *Id.; see e.g., May v. Hopkinson*, 289 S.C. 549, 559, 347 S.E.2d 508, 514 (Ct.App.1986) (affirming the award of damages based on the contractor's repair estimate even though the exact repairs needed could not be determined because the removal of defective wood was expected to reveal additional problems). "The determination of damages may depend to some extent on the consideration of contingent events if a reasonable basis of computation is afforded, permitting a reasonably close estimate of the loss." *Pope*, 395 S.C. at 434, 717 S.E.2d at 781.

 "The basic measure of actual damages is the amount needed to compensate the plaintiff for the losses proximately caused by the defendant's wrong so that the plaintiff will be in the same position he would have been in if there had been no wrongful injury." *Austin v. Specialty Transp. Servs., Inc.*, 358 S.C. 298, 312, 594 S.E.2d 867, 874 (Ct.App.2004).

Our review of the record reveals the circuit court properly charged the jury, "[w]here real estate has been damaged[,] the measure of damages is the difference between the value of the entire premises before and after the injury." The circuit court further charged the jury as follows: "If repairing the building would put it in as good a condition as before the damage[,] then the measure of damages would be the cost of the repair plus any amount by which the building has been decreased due to the damages." *See e.g., Babb v. Lee Cty. Landfill SC, LLC*, 405 S.C. 129, 142–43, 747 S.E.2d 468, 475 (2013) (explaining that "[t]he general rule is that in case of an

injury of a permanent nature to real property, . . . the proper measure of damages is the diminution of the market value by reason of that injury") (quoting *Gray v. S. Facilities, Inc.,* 256 S.C. 558, 569, 183 S.E.2d 438, 443 (1971) (holding damage for permanent injury to real property caused by pollution of a stream is diminution in the market value of the property)).

At trial, Mrs. Graham testified she was advised by her family physician and at the emergency room not to return to the home until the sewage and mold issues were alleviated. Furthermore, she presented evidence regarding the value of the home before the damage, the loss of her home for a significant period of time, several hundred dollars in medical bills, and pain and suffering. The Grahams reasonably declined to repair the home until the Town addressed the sewage problem. Moreover, evidence was presented— through building inspector Thomas Robertson—that a significant quantity of mold was present in the home when he did air quality testing in 2010. Watson's testimony regarding DHEC's "Recommendations for Sewer Clean-up in Residential Homes" established that extensive cleaning, replacement, and repairs would be required before it would be safe for anyone to live in the home. Still, although Benton estimated it would cost $478,280.56 to rebuild the Grahams' home, excluding the price of the property, landscaping, pool, and irrigation system, the jury returned a verdict of less than half this figure—$225,000—for Mrs. Graham.

Therefore, we decline to find error, as the evidence presented at trial supports the jury's verdict. *See Camden v. Hilton,* 360 S.C. 164, 174, 600 S.E.2d 88, 93 (Ct.App.2004) ("In South Carolina, an appellate court must uphold a jury verdict if it is possible to reconcile its various features."); *Hawkins v. Greenwood Dev. Corp.,* 328 S.C. 585, 592–93, 493 S.E.2d 875, 879 (Ct.App.1997) ("The verdict will be upheld if there is *any evidence* to sustain the factual findings implicit in the jury's verdict.") (emphasis added); *Orangeburg Sausage Co. v. Cincinnati Ins. Co.,* 316 S.C. 331, 334, 450 S.E.2d 66, 74 (Ct.App. 1994) ("It is the duty of the court to sustain a verdict when a logical reason for reconciling the verdict can be found.").

### IV. Damages to Personal Property

The Town argues the circuit court erred in denying its motions for directed verdict and JNOV with respect to Mr.

Graham's claim for damages to the personal property located in the storage room. In the alternative, the Town argues it is entitled to a new trial absolute because the jury should not have been permitted to consider the loss or damage to the personal property as an element of damages.

In his complaint, Claude Graham sought damages for the storage shed contents, two damaged automobiles, the impairment of his health and costs of medical treatment for such, the costs of the inconvenience of living temporarily on the second floor of the home, and the expenses of relocating. Because Mr. Graham testified that the damages to his Ford Taurus and Toyota Avalon occurred on September 5th and 6th, 2008, the circuit court disallowed recovery for the automobiles in light of the partial directed verdict in the Town's favor. In response to an inquiry during deliberations, the court charged the jury that "[p]ursuant to legal decisions by the Court, the cars are no longer [an] issue for consideration."

Mr. Graham testified as to the loss of tools, golf equipment, two lawnmowers, a refrigerator, and gardening supplies located in a storage room on the Grahams' property. He opined these items were valued in excess of $8,000. He further testified he paid $70,000 in rent for substitute housing from November 2008 through April 15, 2012. Finally, both Mr. Graham and Dr. Culpepper testified as to the medical issues that both of the Grahams suffered and the need for the Grahams to relocate due to the unhealthy conditions in the East Rice Street home.

The circuit court properly charged the jury that "any damages you would award for personal property would include the difference between the value of the property before the damage and the value of the property after the damage." The jury returned a verdict in favor of Mr. Graham in the amount of $100,000. We agree with the circuit court that the evidence presented at trial supports the jury's verdict. *See Camden,* 360 S.C. at 174, 600 S.E.2d at 93 ("In South Carolina, an appellate court must uphold a jury verdict if it is possible to reconcile its various features."); *Hawkins,* 328 S.C. at 592–93, 493 S.E.2d at 879 ("The verdict will be upheld if there is *any evidence* to sustain the factual findings implicit in the jury's verdict.") (emphasis added); *Orangeburg Sausage Co.,* 316

S.C. at 334, 450 S.E.2d at 74 ("It is the duty of the court to sustain a verdict when a logical reason for reconciling the verdict can be found.").

## THE GRAHAMS' ISSUES ON APPEAL

The Grahams argue the circuit court erred in directing a verdict in favor of the Town regarding Mrs. Graham's claims for inverse condemnation and trespass. The Grahams further argue the circuit court erred in ruling the Town has an easement by prescription for a sewer line located on the Grahams' property.

### I. Inverse Condemnation

 The Grahams contend the circuit court erred in directing a verdict on Mrs. Graham's claim for inverse condemnation, arguing the Town's continued unauthorized use of the Grahams' property—not only for its main sewer line, but also as a dumping ground for raw sewage—constitutes an unconstitutional taking. We disagree.

 "Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Hawkins*, 358 S.C. at 290, 594 S.E.2d at 562. "An inverse condemnation may result from the government's physical appropriation of private property, or it may result from government-imposed limitations on the use of private property." *Byrd v. City of Hartsville*, 365 S.C. 650, 656, 620 S.E.2d 76, 79 (2005). "[A] plaintiff's right to recovery in an inverse condemnation case is premised upon the ability to show that he or she has suffered a taking." *Hardin v. S.C. Dep't of Transp.*, 371 S.C. 598, 604, 641 S.E.2d 437, 441 (2007). In *Carolina Chloride, Inc. v. S.C. Dep't of Transp.*, our supreme court reiterated that an action for inverse condemnation requires: "(1) affirmative conduct of a government entity; (2) the conduct effects a taking; and (3) the taking is for a public use." 391 S.C. 429, 435, 706 S.E.2d 501, 504 (2011). "To prevail in such an action, a plaintiff must prove 'an affirmative, aggressive, and positive act' by the government entity that caused the alleged damage to the plaintiff's property." *Carolina Chloride, Inc. v. Richland*

*Cty.,* 394 S.C. 154, 170, 714 S.E.2d 869, 877 (2011) (quoting *WRB Ltd. P'ship v. Cty. of Lexington,* 369 S.C. 30, 32, 630 S.E.2d 479, 481 (2006)).

In *Rolandi v. City of Spartanburg,* Rolandi alleged damage to real and personal property resulting from the backup of the City's sewer line. 294 S.C. 161, 163, 363 S.E.2d 385, 386 (Ct.App.1987). This court affirmed the trial court's rejection of Rolandi's "unauthorized 'taking' claim," noting Rolandi "failed to allege the damage resulted from an affirmative, aggressive, positive act on the part of the City." *Id.* at 164–65, 363 S.E.2d at 387. In *Hawkins v. City of Greenville,* this court affirmed summary judgment for the City of Greenville on an inverse condemnation claim, emphasizing that "[a]llegations of mere failure to act are insufficient" to establish an "affirmative, positive, aggressive act" by the municipality. 358 S.C. at 291, 594 S.E.2d at 563.

Here, as in *Hawkins,* most of the acts averred to support the Grahams' inverse condemnation claim are more appropriately characterized as mere failures to act. *See Hawkins,* 358 S.C. at 291, 594 S.E.2d at 562. Based on the lack of any evidence demonstrating an "affirmative, positive, aggressive act" by the Town which would tend to prove the Town's actions caused or precipitated the sewage backups and flooding damages, we hold the circuit court properly directed a verdict in favor of the Town on the inverse condemnation claim.

## II. Trespass

The Grahams contend the circuit court erred in directing a verdict in favor of the Town regarding Mrs. Graham's claim for trespass, arguing there was ample evidence of the Town's affirmative conduct to support a claim of trespass. We disagree and affirm.

Trespass to land is an interference with another's present right of possession. *See generally Prosser and Keeton on Torts* § 13. The historical requirements for recovery under the common law action of trespass include "an invasion (a) which interfered with the right of exclusive possession of the land, and (b) which was a direct result of some act committed by the defendant." *Id.* at 67. Trespass has been

defined as "any intentional invasion of the plaintiff's interest in the exclusive possession of his property." *Hawkins*, 358 S.C. at 296, 594 S.E.2d at 565 (citations omitted). "To constitute actionable trespass, however, there must be an affirmative act, invasion of land must be intentional, and harm caused must be the direct result of that invasion." *Id.* at 296, 594 S.E.2d at 565–66 (quoting *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct.App.1991)). "The gist of trespass is the injury to possession, and generally either actual or constructive possession is sufficient to maintain an action for trespass." *Id.* at 296, 594 S.E.2d at 566.

In directing a verdict in favor of the Town on Mrs. Graham's trespass claim, the circuit court ruled, "I'm going to grant the directed verdict as to trespass on the same basis that there is not an affirmative act on the part of the [Town] for the same reasons as inverse condemnation." The Grahams argue the circuit court referred to the "affirmative, positive, aggressive act," which is required to prove inverse condemnation, but not required to prove trespass. However, our review of the record reveals the circuit court did no such thing. To the contrary, the circuit court explained:

> [T]here was no affirmative act with respect to the release of sewage on . . . September 5th and 6th, and that continued release of sewage [was] not an affirmative act as recognized by case law. . . . [A]s it relates to the September 5th and 6th incident there was not an intentional act. There was no intent for there to be any release of sewage or there was no intent that—on the part of the Town for any actions to occur on the property of the [Grahams]. And so for those reasons I find that the directed verdict should be granted as [to Mrs. Graham's claim for] trespass.

▮▮▮ "Trespass does not lie for nonfeasance or failure to perform a duty." *Snow*, 305 S.C. at 553, 409 S.E.2d at 802. In *Snow*, this court found, "the immediate cause of the entry on the Snows' land was the discharge of water from the leaking pipe joint." 305 S.C. at 554, 409 S.E.2d at 802. "[T]he City was not aware of the leak until Mr. Snow brought it to their attention. The Snows make no claim to the contrary." *Id.* Moreover, Mr. Snow conceded "the City did *not* intentionally allow the water to escape onto his property." *Id.* This court found that "[s]ince the event which constituted

the entry was not a voluntary act of the City, an action for trespass will not lie." *Id.*

Here, Mrs. Graham argues the construction and operation of the municipal water system by the Town is sufficient evidence of trespass. However, Mrs. Graham presented no evidence that the Town intentionally released sewage onto the Grahams' property on September 5th or 6th, 2008, or that it continued to intentionally release sewage on subsequent dates thereafter. This court has previously rejected the notion that nonfeasance or failure to act may support a claim for trespass. Accordingly, we affirm the circuit court's granting of directed verdict on the trespass claim.

### III. Easement by Prescription

■■■■ Mrs. Graham asserts the circuit court erred in ruling *sua sponte* that the Town has an easement by prescription for the sewer line on the Graham property. We disagree. First, the issue of the prescriptive easement was raised and addressed by the Town at the directed verdict stage; there was no *sua sponte* ruling. Mrs. Graham never objected to the circuit court's consideration of the prescriptive easement issue, and she presented evidence addressing the elements of a prescriptive easement in her case in chief. Moreover, Mrs. Graham never argued that the prescriptive easement issue was not properly raised or that the court's consideration of the question violated her due process rights. *See Staubes v. City of Folly Beach,* 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review."). Therefore, we find the question of the prescriptive easement is unpreserved for appellate review.

### CONCLUSION

Accordingly, the decision of the circuit court is

**AFFIRMED.**

SHORT, J., concurs.

CURETON, A.J., concurring in a separate opinion.

CURETON, A.J.

I concur in the result reached by the majority. I write separately, however, to address Section III of the opinion on damages.

First, I find the Town is not entitled to a new trial because the circuit court allowed Benton to testify about an estimate to rebuild the Grahams' house. At trial, the Grahams presented evidence from which the jury could infer that the house was in an unlivable condition. Although Watson testified people can continue living in a house after a sewage overflow, there was evidence the sewage pipe ran underneath the Grahams' house. Specifically, Mr. Graham testified he was informed by the Town's director of public works that the sewer line ran across his property underneath his house. Additionally, although Davis did not specifically locate the pipe in his evaluation, he testified it ran underneath the Grahams' house. Davis opined the location of the line under the house hindered access for repairs and maintenance, and any problems with the sewer line would create wet conditions that could cause health problems or damage the structure of the house. Moreover, Dr. Culpepper testified he insisted the Grahams leave the house and saw an improvement in their respiratory symptoms after their move. Based on the evidence of the line running underneath the house and the medical testimony, the jury could infer the house could not be made safe for human habitation and was therefore a total loss. Accordingly, I find Benton's testimony about the reconstruction cost for the house was relevant. *See Roland v. Palmetto Hills,* 308 S.C. 283, 286, 417 S.E.2d 626, 628 (Ct.App.1992) ("[T]he cost of repair or restoration is a valid measure of damages for injury to a building.").

Furthermore, viewing the evidence in the light most favorable to the Grahams, I find the circuit court did not abuse its discretion in denying the Town's motion for JNOV with respect to Mrs. Graham's claim for the amount of damages to the real property. *See Welch v. Epstein,* 342 S.C. 279, 299, 536 S.E.2d 408, 418 (Ct.App.2000) ("When reviewing the denial of a motion for directed verdict or JNOV, this Court must employ the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party."). Benton, who was qualified as

an expert in "estimating residential home building," estimated it would cost $478,280.56 to rebuild the Grahams' home. Benton's testimony was sufficient to create a factual question for the jury as to damages incurred to real property. *See Scott v. Fort Roofing & Sheet Metal Works, Inc.,* 299 S.C. 449, 451, 385 S.E.2d 826, 827 (1989) ("A competent estimate of the cost of repair to a building creates a factual issue regarding damages."). Moreover, the jury awarded a general verdict in favor of Mrs. Graham for actual damages. In addition to the evidence of damages to real property, Mrs. Graham presented evidence of medical bills, the loss of use of her home, and pain and suffering that further support the jury's damages award. Because there was evidence to support the damages award, I find the circuit court did not abuse its discretion. *See Austin,* 358 S.C. at 310, 594 S.E.2d at 873 ("Our task in reviewing a damages award is not to weigh the evidence, but to determine if there is any evidence to support the damages award.").

For the foregoing reasons, I think the result reached by the majority is correct and would affirm the circuit court.