620 S.E.2d 76

**Phelix BYRD, Appellant,**

v.

**The CITY OF HARTSVILLE and Darlington County, Defendants,**

**Of which The City of Hartsville is Respondent.**

No. 26040.

Supreme Court of South Carolina.

Heard Feb. 3, 2005.

Decided Sept. 19, 2005.

---

Charles S. Altman, of Finkel & Altman, of Charleston, for Appellant.

David L. Morrison and Andrew F. Lindemann, both of Davidson, Morrison & Lindemann, of Columbia, and Martin S. Driggers, of Driggers & Moyd, of Hartsville, for Respondent.

Justice PLEICONES:

This is an inverse-condemnation case. Appellant Phelix Byrd (Byrd) appeals from the circuit court's grant of summary judgment for Respondent City of Hartsville (the City). We certified the case pursuant to Rule 204(b), SCACR. We affirm.

## FACTS

Byrd owned land that lay partly in the City (the City Tract) and partly in Darlington County. The property was part of what used to be Coker Farms, a National Historic Landmark

(NHL).[1] After Coker Farms was divided and sold piecemeal, the NHL designation remained over all of the parcels, including Byrd's. As discussed below, the City's desire to maintain the NHL designation is central to this action.

Byrd wanted to subdivide his property and sell parcels to developers. He eventually found someone interested in buying and developing a small parcel (the Small Parcel) of the City Tract. The City Tract was zoned for agricultural use, however, and the sales contract was conditioned on the Small Parcel being zoned for commercial use. Thus, a petition to rezone the Small Parcel was filed with the City.

The City Council repeatedly deferred action on the matter. The City feared that commercial development of any part of Coker Farms without the blessing of the National Park Service would lead to revocation of the NHL designation for all of Coker Farms.[2] In fact, a non-profit organization was working with the National Park Service on preserving the Coker Farms NHL designation through an agricultural trust. The City believed that a premature rezoning would disrupt that effort, and it delayed action on the petition until it was satisfied that rezoning the Small Parcel would not jeopardize the NHL.

Eleven months after the petition was filed, the City announced that it was assured that rezoning Byrd's property would not affect the NHL. The City therefore zoned the Small Parcel for commercial use. By this time, though, Byrd's purchaser had lost the financing necessary to develop the property, and the sale never closed.

Three months later, Byrd filed a petition to zone the rest of the City Tract for commercial use. The City granted this request less than two months after it was made.

---

1. The National Park Service, a division of the United States Department of the Interior, has authority over NHL designations.

2. According to the unsworn statements of two employees of the National Park Service, NHL status does not prohibit the property owner from developing the property, but the service might remove the designation if development changes "the integrity of the designation." These employees also stated that the National Park Service might assist a property owner who wants to retain NHL status and also improve his property. The parties stipulated that these unsworn statements would be admissible at a trial of this case.

Soon thereafter, Byrd entered into contracts to sell parcels of the City Tract for development. These sales were not consummated, however, because Darlington County (the County), which maintained the records for both County and City property, would not approve the deeds. The reason was that the tax records for Byrd's property contained "flags" restricting the issuance of deeds.[3] In an attempt to protect the NHL designation, the County had placed these flags on the tax records for all Coker Farms property, whether located in the County or the City. The flags were not removed from Byrd's records until about three years after the City Tract had been rezoned.

## PROCEDURAL POSTURE

Byrd asserted two causes of action against the City. First, he claimed that the delay of the zoning petitions effected a regulatory inverse condemnation of the City Tract. Second, he claimed that the City engaged in a civil conspiracy with the County in flagging the tax records.[4]

In separate orders, the circuit court granted summary judgment for the City on both the inverse-condemnation and conspiracy claims. With respect to the latter, the court held that even if there were a conspiracy, the City would be immune from liability under the Tort Claims Act.[5] Byrd did not appeal from that ruling, so it is not before the Court. *See S.C. Farm Bureau Mut. Ins. Co. v. S.E.C.U.R.E. Underwriters Risk Retention Group*, 353 S.C. 249, 251, 578 S.E.2d 8, 9 n. 1 (2003) (holding that a ruling not challenged on appeal is the law of the case, regardless of the correctness of the ruling). We therefore address only the inverse-condemnation claim.

## ISSUE

Whether the circuit court erred in granting summary judgment for the City on Byrd's inverse-condemnation claim.

---

3. The flags stated: "N'tl Park Ser. Ord/No Per Or Deeds Issued."

4. The County settled with Byrd.

5. The circuit court relied on the provision that a "governmental entity is not liable for loss resulting from: employee conduct ... which constitutes ... intent to harm...." S.C.Code Ann. § 15–78–60(17) (Supp.2003).

## STANDARD OF REVIEW

 In reviewing a grant of summary judgment, we apply the same standard as the circuit court. *Osborne v. Adams,* 346 S.C. 4, 7, 550 S.E.2d 319, 321 (2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. "[T]he evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party." *Osborne,* 346 S.C. at 7, 550 S.E.2d at 321.

## ANALYSIS

 Both the United States Constitution and the South Carolina Constitution provide that if the government takes private property for public use, then it must compensate the owner for the value.[6] While the government typically takes property through an eminent-domain proceeding,[7] a taking may occur without such a proceeding. That is called "inverse condemnation." *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250, 265 (1987). An inverse condemnation may result from the government's physical appropriation of private property, or it may result from government-imposed limitations on the use of private property.

---

**6.** The Takings Clause of the Fifth Amendment to the United States Constitution provides "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1; *Chicago, B. & Q.R. Co. v. City of Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

In addition, the South Carolina Constitution states, "Except as otherwise provided in this Constitution, private property shall not be taken for public use without just compensation being first made therefor." S.C. Const. art. I, § 13. Takings analysis under South Carolina law is the same as the analysis under federal law. *Westside Quik Shop, Inc. v. Stewart,* 341 S.C. 297, 306, 534 S.E.2d 270, 275 (2000).

**7.** *See* The South Carolina Eminent Domain Procedure Act, S.C.Code Ann. §§ 28–2–10 through 28–2–510 (1991 and Supp.2004).

Whether physical or regulatory, this Court has held that there are four elements to inverse condemnation: (1) affirmative conduct of a government entity; (2) the conduct effects a taking; (3) the taking is for public use; and (4) the taking has some degree of permanence. *See, e.g., Berry's On Main, Inc. v. City of Columbia,* 277 S.C. 14, 15, 281 S.E.2d 796, 797 & n. 2 (1981). We take this opportunity to modify and clarify that test.

First, we remove the element "some degree of permanence," for it conflicts with the principle that the government must compensate for even a temporary taking. *See First English,* 482 U.S. at 318, 107 S.Ct. at 2388, 96 L.Ed.2d at 266 (stating that temporary takings are "not different in kind from permanent takings, for which the [United States] Constitution clearly requires compensation").

■ Second, the element requiring the taking be for "public use" does not apply to regulatory-takings cases. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 326, 122 S.Ct. 1465, 1481, 152 L.Ed.2d 517, 542–43 (2002) (emphasizing that "neither a physical appropriation nor a public use has ever been a necessary component of a regulatory taking"). Consequently, there are only two elements to a regulatory inverse condemnation: affirmative conduct and a taking. In this case, Byrd has alleged a regulatory inverse condemnation, so summary judgment is appropriate only if there is no genuine issue of material fact with regard to the Citys affirmative conduct or the taking of the City Tract.

## I. AFFIRMATIVE CONDUCT

Byrd has presented evidence of affirmative conduct on the part of the City in ruling on the zoning petitions. But for the City's zoning ordinances, the petitions would have been unnecessary. Regulatory delay is part of the regulatory process, so indeed it is the product of governmental action.

Byrd is incorrect, however, in asserting that the City engaged in a single course of conduct—a thirteen-month delay of a decision to rezone his property. Byrd's argument overlooks that there was a three-month gap between the City's granting the petition to rezone the Small Parcel and the filing of the petition to rezone the rest of the City Tract. The City

engaged in two separate courses of conduct, one being the eleven-month delay of the decision whether to rezone the Small Parcel; the other being the two-month delay of the decision whether to rezone the remainder of the City Tract. We separately address the takings issue with respect to these two delays.

## II. Taking

First, we find that this case is governed by *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). We then address the nature of the *Penn Central* inquiry in the context of regulatory delay. Last, we find that Byrd is unable to prove a taking.

### A. *Penn Central* Governs This Case

Byrd's regulatory-inverse-condemnation action is governed by *Penn Central* because it stems from Byrd's having suffered a temporary denial of less than all economically viable use of his property.[8] Until recently, there might have been some confusion as to whether a case like Byrd's was governed by *Penn Central*, *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), or both. In light of the United States Supreme Court's decision in *Lingle v. Chevron U.S.A., Inc.*, which overruled *Agins*, it is clear that *Penn Central* controls. —— U.S. ——, 125 S.Ct. 2074, 161 L.Ed.2d 876. To the extent that some of our previous cases have applied *Agins* alone or both *Agins* and *Penn Central*, we overrule them. *Infra*, note 9.

 The general rule is that regulatory-takings cases require "essentially ad hoc, factual inquiries," balancing all relevant circumstances to determine whether the government has taken property. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. Two circumstances are especially important: (1) "the economic impact on the claimant, and, particularly, the extent to which the [government] has interfered with distinct investment-backed expectations;" and (2) "the character of the governmental action." *Penn Central*,

---

8. It was less than all use because Byrd was able, and periodically did, farm his property throughout the delay. This use was permitted because the land was then zoned for agricultural use.

438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648; [9] *see also Denene, Inc. v. City of Charleston,* 359 S.C. 85, 98–99, 596 S.E.2d 917, 924 (2004); *Sea Cabins on the Ocean IV Home-owners Ass'n v. City of North Myrtle Beach,* 345 S.C. 418, 430, 548 S.E.2d 595, 601 (2001).

■■■ When, however, it has been factually determined that a property owner has been deprived of all economic use of his property, there is a taking *per se.*[10] *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014–19, 112 S.Ct. 2886, 2892–95, 120 L.Ed.2d 798, 812–15 (1992). Because Byrd's loss was only temporary, and because Byrd was able to farm his property, no taking *per se* occurred here.

■■■ In *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* the Court held that *Lucas* does not apply when the property owner has suffered a temporary loss of all economically viable use. 535 U.S. 302, 331–32, 122 S.Ct. 1465, 1484, 152 L.Ed.2d 517, 546–47 (2002). Because

---

**9.** *Agins* was decided two years after *Penn Central,* and the *Agins* Court used different language to describe the takings test. The Court held that a taking was effected if: (1) a legitimate state interest was not substantially advanced; or (2) the landowner was denied economically viable use of his or her property. *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141, 65 L.Ed.2d at 112.

After *Agins* was decided, some courts separately applied *Penn Central* and *Agins* to determine whether a taking had occurred. *See, e.g., Main v. Thomason,* 342 S.C. 79, 88, 535 S.E.2d 918, 922 (2000) (stating that federal courts use *Penn Central,* while the "South Carolina" test is *Agins,* and applying the two separately) (subsequent history omitted); *Westside Quik Shop, Inc.,* 341 S.C. at 305–06, 534 S.E.2d at 274 (applying the two separately). Other courts found that the tests were essentially the same and made only one inquiry. *See, e.g., Santini v. Conn. Hazardous Waste Mgmt. Serv.,* 342 F.3d 118, 132 (2d Cir.2003) (noting that *"Agins* is easily reconciled with *Penn Central"*), *cert. denied,* —— U.S. ——, 125 S.Ct. 104, 160 L.Ed.2d 126 (2004). As noted above, the United States Supreme Court has now overruled *Agins* and clarified that *Penn Central* is the test to be applied when no *per se* taking is involved. *Lingle v. Chevron U.S.A., Inc.,* —— U.S. ——, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).

**10.** There is an exception: the government need not compensate for a total economic loss if "the proscribed use interests were not part of [the owner's] title to begin with." *Lucas,* 505 U.S. at 1027, 112 S.Ct. at 2899, 120 L.Ed.2d at 820; *see also Lucas v. S.C. Coastal Council,* 309 S.C. 424, 424 S.E.2d 484 (1992) (finding on remand that the exception did not apply to the case).

time is a component of an interest in property, the property owner in that situation has suffered a partial loss, not a total one. Once the temporary restriction is lifted, value will return. *Tahoe–Sierra,* 535 U.S. at 331–32, 122 S.Ct. at 1484, 152 L.Ed.2d at 546. In such a case, the court must apply *Penn Central* to determine whether there has been a taking.

The City argues that Byrd's case is distinguishable from *Tahoe–Sierra* in that Byrd has not alleged a temporary loss of *all* economically viable use. As a matter of law, the City asserts, there is no taking if the property owner has suffered a temporary loss of only part of the economically viable use of the property. We disagree. While this case might be factually different from *Tahoe–Sierra,* there the United States Supreme Court expressly rejected the adoption of categorical rules in the context of regulatory takings. If *Lucas* does not apply, then *Penn Central* does.[11] That is the case here.

### B. *Penn Central* And Regulatory Delay

 In the context of regulatory delay, the *Penn Central* inquiry is whether the delay ever became unreasonable. Byrd is not entitled to compensation merely because he had to obtain a zoning change to develop his property. *See Tahoe–Sierra,* 535 U.S. at 334–35, 122 S.Ct. at 1485, 152 L.Ed.2d at 548 (stating that "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like ... have long been considered permissible exercises of the police power") (quotation omitted); *Sea Cabins,* 345 S.C. at 436, 548 S.E.2d at 604.[12] Until regulatory delay becomes unreasonable, there is no taking. *See First English,* 482 U.S. at 320, 107

---

**11.** We overrule our prior suggestions that a property owner cannot demonstrate a taking unless he has been denied all economically viable use of his property. *See Glover v. County of Charleston* 361 S.C. 634, 640, 606 S.E.2d 773, 777 (2004) (holding that the property owners involved could not demonstrate a taking because they had not been, "even temporarily, denied all economically viable use of their land"); *Greenville County v. Kenwood Enterprises, Inc.,* 353 S.C. 157, 176, 577 S.E.2d 428, 438 (2003) (holding that that there was no taking because the property owner had not been deprived of "all economically viable use of its land"). Nevertheless, the results reached in these cases were correct.

**12.** We can thus immediately dispose of Byrd's claim that a taking commenced when the petition to rezone the Small Parcel was filed.

S.Ct. at 2388, 96 L.Ed.2d at 267; *Agins,* 447 U.S. at 263, 100 S.Ct. at 2143, 65 L.Ed.2d at 113 n. 9. The length of the delay alone is not determinative. *Tahoe–Sierra,* 535 U.S. at 342, 122 S.Ct. at 1489, 152 L.Ed.2d at 553. Rather, we consider all relevant circumstances, including the reasons for the delay and the economic impacts on Byrd. And under the "parcel as a whole" doctrine, we must consider those impacts in relation to Byrd's entire interest in the City Tract.[13] *See Tahoe–Sierra,* 535 U.S. at 331, 122 S.Ct. at 1483, 152 L.Ed.2d at 546; *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. at 2662, 57 L.Ed.2d at 652; *Beard v. S.C. Coastal Council,* 304 S.C. 205, 207–08, 403 S.E.2d 620, 622 (1991).

### C. The Eleven–Month Delay

■ As mentioned above, for eleven months the City delayed action on the petition to zone the Small Parcel for commercial use. Byrd has presented no evidence that this delay effected a taking of the City Tract.

Preserving the NHL designation was a legitimate governmental interest,[14] and delaying the zoning decision was a reasonable means of furthering that interest. Commercial development might have caused the National Park Service to remove the designation.[15]

---

**13.** The City argues that under the parcel-as-a-whole doctrine, the Court should treat the City Tract and the portion of Byrd's property in the County as one tract because the two were contiguous. We disagree. The City had no jurisdiction over the property in the County.

**14.** In fact, preserving landmark status was the interest involved in *Penn Central,* and the landowners did not challenge the legitimacy of the interest. 438 U.S. at 128–29, 98 S.Ct. at 2661–62, 57 L.Ed.2d at 651–52.

**15.** The dissent raises valid concerns regarding government interference with private property that is related to no legitimate interest. In our view, however, preserving the NHL designation was a legitimate interest. Further, a careful review of the record reveals that Byrd has presented no evidence that at any point during the eleven-month delay, the City's fear of losing the NHL designation was unreasonable. In fact, the only evidence in the record is to the contrary.

In addition, contrary to Byrd's claim, there is no evidence that the delay was the result of bad faith on the part of the City. *See, e.g., Bass Enter. Prod. Co. v. United States,* 381 F.3d 1360 (Fed.Cir.2004) (noting

Further, there is no evidence that the City's interest ever became disproportionate to the economic impacts on Byrd.[16] First, the delay did not affect the use to which Byrd was putting the City Tract before the rezoning petition was filed. The land was zoned for agricultural use, and Byrd's ability to farm the land was never disturbed. *See Penn Central,* 438 U.S. at 136, 98 S.Ct. at 2665, 57 L.Ed.2d at 656 (calling the existing use of the property the owner's "primary expectation"). Second, Byrd's only investment-backed expectation concerned the sale of the Small Parcel. The delay's interference with this expectation arguably impacted the value of the entire City Tract, but even with the evidence viewed in a light most favorable to Byrd, any such impact was too slight to render the delay unreasonable.

In sum, there is no issue of material fact regarding the legitimacy of the City's conduct or the slight nature of the economic impact on Byrd. Byrd therefore cannot demonstrate that the delay ever became unreasonable, which means that he cannot demonstrate a taking.

### D. The Two–Month Delay

■ Similarly, there is no evidence that the two-month delay of the decision to rezone the rest of the City Tract ever became unreasonable. Byrd does not even argue that the City should generally grant a zoning petition in less than two months. Further, it is undisputed that the delay did not affect Byrd's ability to farm the property or that Byrd had no investment-backed expectations with which the delay interfered. Consequently, Byrd cannot demonstrate that the two-month delay effected a taking.

### CONCLUSION

The evidence presented demonstrates that no material issue of fact exists and that the City is entitled to judgment as a

---

that a relevant consideration under *Penn Central* is whether the government has acted in bad faith).

**16.** The dissent focuses on the duration of the delay without considering the economic impact, as required under *Penn Central.* As explained above, the duration of the delay is not determinative. *Tahoe–Sierra,* 535 U.S. at 342, 122 S.Ct. at 1489, 152 L.Ed.2d at 553.

matter of law. Byrd cannot demonstrate that the City inversely condemned his property through regulatory delay. Accordingly, the grant of summary judgment for the City is

**AFFIRMED.**

MOORE, WALLER and BURNETT, JJ., concur.

TOAL, C.J., dissenting in a separate opinion.

Chief Justice TOAL:

I respectfully dissent. The majority asserts that the City acted reasonably in delaying Appellant's investment-backed zoning request for a period totaling eleven months. I disagree.

Both the Fifth and Fourteenth Amendments to the United States Constitution recognize that the government has the authority to interfere with a private citizen's property rights to promote the common good. *See Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (recognizing the government's powers of eminent domain). However, when the government interferes with a private citizen's property rights and this interference is not related to any legitimate public interest, the government has acted beyond the scope of its authority. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

In my opinion, the City's decision to delay the land's rezoning was *ultra vires* and unreasonable. The record indicates that rezoning the land for commercial purposes would not have affected the NHL status of the land. In addition, the City had ample opportunity to determine that rezoning the land would not have affected the land's NHL status.

The majority focuses on the City's concern that the rezoning would likely cause the land to lose its NHL status. In my opinion, under the facts of this case, eleven months was more than enough time for the City to investigate and determine whether it had a legitimate public interest in delaying rezoning. In my view, according to the facts of this case and the United States Supreme Court's ruling in *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57

L.Ed.2d 631 (1978), Appellant is entitled to just compensation for the temporary, regulatory taking of his land. I would therefore reverse the trial court's decision and award reasonable compensation accordingly.