# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

James Marlowe and Lori Marlowe, Appellants,

v.

South Carolina Department of Transportation (SCDOT), Respondent.

Appellate Case No. 2020-000614

———

Appeal from Florence County
Michael G. Nettles, Circuit Court Judge

———

Opinion No. 6028
Heard June 7, 2023 – Filed September 27, 2023

———

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

———

Joseph Clay Hopkins, of Charleston, for Appellants.

John B. McCutcheon, Jr., of Thompson & Henry, PA, of Conway; Carmen Vaughn Ganjehsani, of Richardson Plowden & Robinson, PA, of Columbia; and S. Ashley Gwin, of Conway; all for Respondent.

———

**GEATHERS, J.:** In this action, Appellants James Marlowe and Lori Marlowe appeal the circuit court's order granting Respondent South Carolina Department of Transportation (SCDOT)'s motion for summary judgment. The Marlowes argue summary judgment was inappropriate because (1) SCDOT's negligence was a question for the jury; (2) the acts performed by SCDOT were sufficient to support a finding of inverse condemnation; and (3) the Stormwater Management and Sediment

Reduction Act (Stormwater Act) does not apply. We affirm in part, reverse in part, and remand.

## FACTS

The Marlowes are the owners of property located in Pamplico, South Carolina (the Property). In August 2013, SCDOT conducted a hydraulic design study in preparation for a project to widen sections of U.S. Highway 378 (the Project). As a part of the study, the SCDOT examined various conditions related to the roadway abutting the Property and concluded that existing bridge box culverts in the area would continue to protect against a 100-year flood event.[1] SCDOT also planned to replace the existing culvert near the Property with a larger one to alleviate drainage issues associated with the Project. While the specific dates are unclear, the parties agree that construction had begun in 2015 and that by 2016, the new elevated roadway had been laid adjacent to the existing highway.

On October 4, 2015, torrential rain poured across South Carolina during what came to be known as "the thousand-year-flood."[2] During this cataclysmic event, the Property experienced high levels of flooding. The Marlowes salvaged some of their belongings and moved out of their residence. After extensive work was performed on the Property with assistance from the Federal Emergency Management Agency,

---

[1] To meet SCDOT's hydraulic requirements, a culvert must be able to divert water away from one side of a highway to another up to a "100-year flood."

> The term "100-year flood" is used in an attempt to simplify the definition of a flood that statistically has a 1-percent chance of occurring in any given year. Likewise, the term "100-year storm" is used to define a rainfall event that statistically has this same 1-percent chance of occurring.

Water Science School, *The 100-Year Flood*, U.S. Geological Surv., https://www.usgs.gov/special-topics/water-science-school/science/100-year-flood (June 7, 2018).

[2] Referring to the 2015 weather event as the "thousand-year flood" is a misnomer because, as will be discussed later in this opinion, the likelihood that this event will occur in a given year is more than 1 in 1,000. Thus, to avoid confusion, we will refer to this event as the "2015 event."

the Marlowes were able to move back to the Property.  On October 5, 2016, approximately eight weeks after the Marlowes moved back, Hurricane Matthew (2016 event) hit South Carolina and the Property flooded again with approximately 15 to 16 inches of rain.  The Marlowes have been unable to return to the Property.

On February 22, 2019, at the request of the Marlowes' counsel, Applied Building Sciences (ABS) conducted an engineering evaluation assessing the impact of the flood on the property (ABS report).

Using data collected from volunteer precipitation measuring stations[3], ABS discovered that during the 2015 event,

> [t]he two stations closest to the subject property recorded a peak 24-hour precipitation of 5.96[]inches to 6.52[]inches, which corresponds to a return interval[4] of greater than 10[]years but less than 25[]years; [and] . . . [t]he two stations closest to the subject property recorded a 4-day precipitation of 12.76[]inches to 14.16[]inches,

---

[3] These stations are commonly known as "CoCoRaHS stations."  According to the CoCoRaHs website, "CoCoRaHS is an acronym for the Community Collaborative Rain, Hail and Snow Network.  CoCoRaHS is a unique, non-profit, community-based network of volunteers of all ages and backgrounds working together to measure and map precipitation (rain, hail and snow)."  *About Us*, Cmty. Collaborative Rain, Hail & Snow Network, https://www.cocorahs.org/Content.asp x?page=aboutus (last visited Sept. 25, 2023).

[4] "The recurrence [or return] interval is based on the probability that the given event will be equaled or exceeded in any given year."  *Floods: Recurrence intervals and 100-year floods*, U.S. Geological Surv., https://www.usgs.gov/centers/new-jersey-water-science-center/floods-recurrence-intervals-and-100-year-floods (last visited Sept. 25, 2023).  At each return interval, precipitation frequency estimates vary by time.  For example, at the Property's location, a 100-year event occurs when 9.346 inches of rain fall within the peak 24 hours of a storm.  *See NOAA Atlas 14 Point Precipitation Frequency Estimates: SC*, NOAA's Nat'l Weather Serv.: Hydrometeorological Design Studies Ctr., https://hdsc.nws.noaa.gov/pfds/pfds_ma p_cont.html?bkmrk=sc (last visited Sept. 25, 2023).  However, a 100-year event also occurs when 11.6 inches of rain fall within the peak four days of a storm.  *See id.*

corresponding to a return interval of between 200[] to 500[]years[.]

ABS found that during the 2016 event,

[t]he two stations closest to the subject property recorded a peak 24-hour precipitation of 6.24[]inches to 6.30[]inches, which corresponds to a return interval of greater than 10[]years but less than 25[]years; [and] . . . [t]he station closest to the subject property with four consecutive days of data available recorded a total of 11.37[]inches, corresponding to a return interval of between 100[] to 200[]years[.][5]

In 2016, SCDOT received a customer service complaint from the Marlowes asking for an explanation of some of the design elements of the Project. Brian Dix, the program manager of the project, called the Marlowes to explain the Project's construction status. Specifically, Dix explained that a new culvert was being installed that should assist with drainage, but that the culvert could not be fully implemented until a nearby bridge over the Lynches River was completed. Dix stated that the bridge's construction needed to be prioritized due to traffic difficulties.

In January 2017, the bridge was completed, the old roadway was removed, and the new culvert was fully constructed to support the new elevated highway. Later that year, SCDOT began to receive complaints from property owners affected by the 2015 and 2016 weather events. In response to these complaints, SCDOT conducted a more detailed survey of the area that included the Property. Based on more accurate data than was available in their original survey conducted in 2013, SCDOT found that before the construction began, the existing culvert would be at capacity when impacted by "a flood associated with the 25-year return interval and potentially the ten-year interval." Floods of greater magnitude would result in a phenomenon known as "overtopping." Overtopping occurs where an overburdened drainage system fails to divert water away from a roadway and as a result, the roadway becomes flooded with the excess water.

---

[5] We note that the second closest station with 4-day peak range data available recorded a total of 13.7 inches corresponding to a return interval of 200 to 500 years.

On May 3, 2017, the Marlowes brought this action against the SCDOT, Southern Asphalt, Inc., and United Infrastructure Group, Inc., alleging causes of action for inverse condemnation, conversion, due process, and negligence. According to the Marlowes, two consent orders were later filed dismissing all claims against Southern Asphalt, Inc., and United Infrastructure Group, Inc.[6]

On February 10, 2020, a hearing was held in response to SCDOT's motion for summary judgment. On March 25, 2020, the circuit court issued an order granting the motion. In its order, the circuit court included the following excerpt from the deposition testimony of Jason Gregorie, the Marlowes' expert witness and a representative of ABS.

> [I]f the prior U.S. 378 existed and the new U.S. 378 had not been constructed[,] I can say – I do say to a reasonable degree of engineering certainty that the flood depth would have been less on the [P]roperty, and I believe the impact on the [P]roperty would have been less. [I]t's possible that it would have been prevented [altogether]. (Gregorie depo, page 77)

> I can say to a reasonable degree of engineering certainty that the construction project contributed to the flooding. I believe that it increased the flood depth on the property, but I cannot say definitely that if the project had not existed[,] that it would have completely prevented the flooding. (Gregorie depo, page 79)

> A:     Well, . . . to a reasonable degree of certainty, I [believe] that [the Project] has affected . . . the flood depth of the property. I think [] that it . . . may have or there was a possibility it would have prevented the flooding inside the structure altogether.

> Q:     May have?

> A.     That's correct.

---

[6] These consent orders are not in the record before us.

Q:     So[,] . . . you agree that even with the old [highway] with these two rain events[,] the [P]roperty still could have flooded?

A:     It's possible, yes.

(Gregorie depo, page 84)

(Emphasis removed).  This appeal followed.

## ISSUES ON APPEAL

I.     Did the circuit court err in granting summary judgment on SCDOT's liability under the Tort Claims Act (TCA)?

II.    Did the circuit court err in granting summary judgment on whether SCDOT's conduct amounted to an affirmative, positive, aggressive act for the purposes of inverse condemnation?

III.   Did the circuit court err in granting summary judgment under the Stormwater Management and Sediment Reduction Act?

## STANDARD OF REVIEW

"In reviewing the grant of a summary judgment motion, this court applies the same standard which governs the trial court." *Hawkins v. City of Greenville*, 358 S.C. 280, 289, 594 S.E.2d 557, 562 (Ct. App. 2004).  "The proper standard [under Rule 56(c)] is the genuine issue of material fact standard." *Kitchen Planners, LLC v. Friedman*, Op. No. 28173 (S.C. Sup. Ct. filed Aug. 23, 2023) (Howard Adv. Sh. No. 33, 11, 17) (internal quotations omitted) (rejecting the "mere scintilla" standard for summary judgment).  "Summary judgment is proper when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Hawkins*, 358 S.C. at 289, 594 S.E.2d at 562 (quoting Rule 56(c), SCRCP).  "The party seeking summary judgment has the burden of clearly establishing the absence of a genuine issue of material fact." *Id*. at 288, 594 S.E.2d at 561 (quoting *McNair v. Rainsford*, 330 S.C. 332, 342, 499 S.E.2d 488, 493 (Ct. App. 1998)).  "In determining whether any triable issues of fact exist, the evidence and all inferences which can be reasonably drawn therefrom must be viewed in the light most favorable to the nonmoving party." *Id*. (quoting *Lanham v. Blue Cross & Blue Shield of South Carolina, Inc.*, 349 S.C. 356, 361–62, 563 S.E.2d 331, 333

(2002)). "Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law." *Ray v. City of Rock Hill*, 434 S.C. 39, 45, 862 S.E.2d 259, 262 (2021) (quoting *Lanham*, 349 S.C. at 362, 563 S.E.2d at 333). "When the circuit court grants summary judgment on a question of law, we review the ruling de novo." *Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. Builders FirstSource-Se. Grp.*, 413 S.C. 630, 634–35, 776 S.E.2d 434, 437 (Ct. App. 2015).

## LAW/ANALYSIS

### I. Tort Claims Act

The Marlowes argue that the circuit court erred in finding that SCDOT was not liable for damages under the TCA, specifically, S.C. Code Ann. § 15-78-60 (2005). We disagree.

#### A. Maintenance and Design Immunity

The Marlowes argue that because the existing bridge box culvert had a defect or condition and the defect or condition was not cured after adequate notice, SCDOT is liable for the Marlowes' damages.

"The [TCA] waives sovereign immunity for torts committed by the State, its political subdivisions, and governmental employees acting within the scope of their official duties." *Bayle v. S.C. Dep't of Transp.*, 344 S.C. 115, 121, 542 S.E.2d 736, 739 (Ct. App. 2001). However, section 15-78-60 of the TCA provides a list of exceptions to the state's wavier of sovereign immunity.

Under section 15-78-60(15), "[g]overnmental entities are not liable for the design of highways and other public ways." Further,

> [g]overnmental entities responsible for maintaining highways, roads, streets, causeways, bridges, or other public ways are not liable for loss arising out of a defect or a condition in, on, under, or overhanging a highway, road, street, causeway, bridge, or other public way caused by a third party unless the defect or condition is not corrected by the particular governmental entity responsible for the maintenance within a reasonable time after actual or constructive notice[.]

*Id*. Portions of a highway under construction are still under design and are not yet subject to maintenance. *See Summer v. Carpenter*, 328 S.C. 36, 44–45, 492 S.E.2d 55, 59 (1997) (finding that because an "intersection was still under construction[,] . . . the intersection was still under design and not subject to maintenance by [SCDOT].").

Before construction began on the Project, SCDOT's hydraulic design study found no functional deficiencies with the existing culvert. Because SCDOT was not informed of a defect or condition by alternative means, and was not aware of any potential deficiencies until the 2017 study, SCDOT could not have been put on notice as required by section 15-78-60(15). Once construction began, the Project was "under design and not . . . subject to maintenance." *Summer*, 328 S.C. at 44–45, 492 S.E.2d at 59. Any alleged defects or conditions arising during this time—including the 2015 and 2016 weather events—were not yet subject to maintenance and are thereby protected by design immunity. Therefore, under section 15-78-60(15), the SCDOT is not liable for any damages which occurred during or before the construction process.

B. <u>Discretionary Immunity</u>

The Marlowes argue that the question of whether SCDOT or its employees caused the flooding to the Property was a question for the jury. SCDOT argues that its and its employees' actions were protected by discretionary immunity. We agree with SCDOT.

*1. Preservation*

The Marlowes assert that SCDOT's discretionary immunity argument is unpreserved because it was not raised and ruled upon by the circuit court. We disagree.

"[I]t is not always necessary for a respondent—as the winning party in the lower court—to present his issues and arguments to the lower court and obtain a ruling on them in order to preserve an issue for appellate review." *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000). This approach is in keeping with the view, as expressed in Rule 220(c), SCACR, that an appellate court may affirm the lower court's judgment for any reason appearing in the record on appeal.

*2. Merits*

Under the TCA, a governmental entity is not liable for loss resulting from "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee[.]" § 15-78-60(5).

In *Hawkins v. City of Greenville*, a property suffered flooding damage after a record rainfall event. 358 S.C. at 287, 594 S.E.2d at 561. The property owner sued the city of Greenville arguing in part that the city was negligent in failing to replace drainage pipes after allowing the development of neighboring parcels which altered the elevation and added strain to the existing pipes. *Id*. at 291, 594 S.E.2d at 562–63. Our court found that the decision was within the city's discretion, noting that

> [t]he duties of the municipal authorities in adopting a general plan of drainage, and determining when and where sewers shall be built, of what size and at what level, are of a quasi[-]judicial nature, involving the exercise of deliberate judgment and large discretion, and depending upon considerations affecting the public health and general convenience throughout an extensive territory; and the exercise of such judgment and discretion in the selection and adoption of a general plan or system of drainage is not subject to revision by a court or jury in a private action for not sufficiently draining a particular lot of land.

*Id*. at 294, 594 S.E.2d at 564. (quoting *City of Tyler v. Likes*, 962 S.W.2d 489, 501 (Tex. 1997)).

Here, the flooding incident is similar to the events that unfolded in *Hawkins*. The process of altering the highway elevation near the property increased the risk of flooding to the surrounding areas. SCDOT had plans to install the new culvert during the construction process; however, the new culvert was not installed until after the two major weather events. Like the general plan adopted in *Hawkins*, the adoption and execution of SCDOT's drainage plans are of a quasi-judicial nature not subject to revision by our courts. Therefore, SCDOT and its individual employees have discretionary immunity from the Marlowes' negligence claim.

**II.    Inverse Condemnation**

The Marlowes argue that the circuit court erred in granting summary judgment on their inverse condemnation claim.[7] We agree.

"Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Hawkins*, 358 S.C. at 290, 594 S.E.2d at 562. "To establish an inverse condemnation, a plaintiff must show: '(1) an affirmative, positive, aggressive act on the part of the governmental agency; (2) a taking; (3) the taking is for a public use; and (4) the taking has some degree of permanence.'" *Id*. (quoting *Marietta Garage, Inc. v. South Carolina Dep't of Pub. Safety*, 352 S.C. 95, 101, 572 S.E.2d 306, 308 (Ct. App. 2002)).

A. Affirmative, Positive, and Aggressive Act

The Marlowes first argue that there was a genuine issue of material fact that SCDOT's conduct in this case amounted to an affirmative, positive, aggressive act. We agree.

"[T]o prevail in an inverse condemnation action, 'a plaintiff must prove an affirmative, aggressive, and positive act by the government entity that caused the

---

[7] The Marlowes also argue that the circuit court erred in including inverse condemnation in its order because it was not raised in SCDOT's motion for summary judgment. "[T]he [c]ircuit [c]ourt may grant a motion for summary judgment on a ground not included in the notice of the motion if the ground is fully argued before the court without objection." *Turbeville v. Floyd*, 288 S.C. 171, 174, 341 S.E.2d 651, 652–53 (Ct. App. 1986). Although counsel for the Marlowes brought this deficiency to the court's attention, counsel proceeded on the merits of inverse condemnation without obtaining a ruling from the court. *See State v. Black*, 319 S.C. 515, 521, 462 S.E.2d 311, 315 (Ct. App. 1995) ("The proper course to be pursued when counsel makes an improper argument is for opposing counsel to immediately object and to have a record made of the statements or language complained of and to ask the court for a distinct ruling thereon."); *cf Dixon v. Ford*, 362 S.C. 614, 625, 608 S.E.2d 879, 885 (Ct. App. 2005) (finding that a proper objection to a jury charge "requires an objection on the record, opportunity for discussion, and a specific ruling by the trial court"). Therefore, the circuit court did not err in including inverse condemnation in its order.

alleged damage to the plaintiff's property.'" *Ray*, 434 S.C. at 47, 862 S.E.2d at 263 (quoting *WRB Ltd. P'ship v. Cnty of Lexington*, 369 S.C. 30, 32, 630 S.E.2d 479, 481 (2006)). An "affirmative act" only amounts to an "affirmative, positive, aggressive act" when it has been proven to have caused or precipitated the damage in question. *See id* at 47–48, 862 S.E.2d at 264. Also, "[a]llegations of mere failure[s] to act are insufficient." *Hawkins,* 358 S.C. at 291, 594 S.E.2d at 563. "If a genuine issue of material fact exists as to whether the government entity committed an affirmative, positive, aggressive act causing damage to private property, summary judgment is not proper." *Ray*, 434 S.C. at 45, 862 S.E.2d at 262.

The focus of the Marlowes' complaint is SCDOT's alleged failure to install an adequate culvert and its construction of an elevated highway. The failure to install an adequate culvert is, by its very nature, not an affirmative act. The construction of an elevated highway is an affirmative act,[8] but whether it is an "affirmative, positive, aggressive act" for the purposes of inverse condemnation depends on causation. *See Ray*, 434 S.C. at 47–48, 862 S.E.2d at 264 (observing the distinction made in *Hawkins* between mere affirmative acts and "affirmative, positive, aggressive" acts causing damage for purposes of inverse condemnation).

The Marlowes argue that there is evidence in the record that could suggest that the construction of the elevated highway caused the flooding on the property. We agree.

By SCDOT's own assessment conducted in January 2017, the existing culvert would be at capacity during a storm with a 25-year or greater return interval and all excess floodwater would soon rise to the elevation of the existing highway. At this point, the excess water would overtop the existing highway, acting as an additional outlet for the water to escape the Property.

However, the new roadway construction project was built adjacent to, and almost two feet above, the existing roadway. The Marlowes allege that during a storm with a 25-year or greater return interval, the new elevated roadway acted as a barrier to the excess floodwater that would have previously been able to exit the Property via overtopping. According to the eleven nearest volunteer precipitation measuring stations that had four-day precipitation data available, the October 2015 storm ranged from a 100- to 200-year return interval at a minimum and a 200- to

---

[8] *Cf. Hawkins*, 358 S.C. at 291, 594 S.E.2d at 563 (finding that the replacement of a double-box culvert with a large arched pipe and installation of riprap material were affirmative acts).

500-year return interval at a maximum. In comparison, the October 2016 storm ranged from a 200-year to 500-year return interval at a minimum and greater than a 1,000-year return interval at a maximum. Thus, both of these events produced floodwater that exceeded the capacity of the existing culvert at the time of the weather events.

However, it is less clear if, and to what extent, the flooding on the property could have been averted had the new, elevated roadway not been built. Jason Gregorie, the Marlowes' expert witness, testified to the following:

> I can say to a reasonable degree of engineering certainty that the construction project contributed to the flooding. I believe that it increased the flood depth on the property, but I cannot say definitely that if the project had not existed that it would have completely prevented the flooding.
>
> . . . .
>
> I think I say that it may – may have or there was a possibility it would have prevented the flooding inside the structure altogether.

We find that these statements demonstrate a genuine dispute of material fact as to whether the construction caused the flooding of the Property. *See Kitchen Planners, LLC v. Friedman*, Op. No. 28173 (S.C. Sup. Ct. filed Aug. 23, 2023) (Howard Adv. Sh. No. 33, 11, 17). Also, further inquiry into the cause of the flooding is necessary to clarify whether the construction of the elevated highway was an affirmative, positive, aggressive act. *See Ray*, 434 S.C. at 45, 862 S.E.2d at 262 ("Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law." (quoting *Lanham*, 349 S.C. at 362, 563 S.E.2d at 333)). Therefore, viewed in the light most favorable to the Marlowes, Gregorie's statements create a genuine issue of material fact as to whether the highway construction amounted to an affirmative, positive, aggressive act for the purposes of inverse condemnation.

B. <u>Legitimate Government Actions</u>

Alternatively, the circuit court concluded that the Marlowes failed to demonstrate that an affirmative, positive, aggressive act occurred because the

installation of culverts and construction to public roadways are "legitimate government actions" under *Kiriakides v. Sch. Dist. of Greenville Cnty*., 382 S.C. 8, 675 S.E.2d 439 (2009). This was in error.

"An inverse condemnation may result from the government's physical appropriation of private property, or it may result from government-imposed limitations on the use of private property." *Byrd v. City of Hartsville*, 365 S.C. 650, 656, 620 S.E.2d 76, 79 (2005). In its order, the circuit court heavily relied on *Kiriakides*, which addressed the government-imposed limitations on the use of private property, otherwise known as regulatory inverse condemnation. This category is separate and distinct from the government's physical appropriation of private property, also known as physical inverse condemnation. Apart from the type of government action used to condemn private property, the major difference between the two categories is that, contrary to a physical inverse condemnation, "there are only two elements to a regulatory inverse condemnation: affirmative conduct and a taking." *Id*. at 657, 620 S.E.2d at 80; *see also id*. at 657, 620 S.E.2d at 79 (holding that the "some degree of permanence" and "public use" elements from the traditional four-element inverse condemnation test do not apply to regulatory inverse condemnation).

In *Kiriakides*, the owner of a vacant theater sought damages for regulatory inverse condemnation, alleging that the threat of condemnation proceedings stigmatized and devalued his property. 382 S.C. at 12, 15, 675 S.E.2d at 441, 443. Our supreme court found this unpersuasive because "[t]he mere institution of condemnation proceedings does not constitute a taking, as it is a legitimate exercise of the government's authority." *Id*. at 17, 675 S.E.2d at 443. The court also reasoned that the inverse condemnation claim would "preclude the government from engaging in normal activities incident to a condemnation," such as surveying property and obtaining an appraisal. *Id*. at 19, 675 S.E.2d at 445.

In the present case, the Marlowes are seeking recovery for flooding damage under a theory of physical inverse condemnation. Denying recovery based on the supposed legitimacy of SCDOT's actions would provide de facto immunity for any physical actions regularly undertaken by governmental bodies. This is in clear contravention to South Carolina precedent. *See e.g., WRB Ltd. P'ship v. Cnty. of Lexington*, 369 S.C. 30, 33, 630 S.E.2d 479, 481 (2006) (finding that there was a genuine issue of material fact that capping a landfill was an affirmative, positive, and aggressive act that may have caused the migration of methane on an owner's property); *Berry's On Main, Inc. v. City of Columbia*, 277 S.C. 14, 16, 281 S.E.2d 796, 797 (1981) (holding that the removal of a public sidewalk and the excavation

of trenches leading to a business's basement were affirmative, positive, aggressive acts that caused flooding damage). Therefore, we find that applying the *Kiriakides* legitimacy analysis to this case was erroneous as a matter of law. *See* Rule 56(c) ("[Summary] judgment sought shall be rendered forthwith if . . . the moving party is entitled to a judgment as a matter of law.").

## III.    The Stormwater Act

The Marlowes argue that the circuit court erred in using the Stormwater Management and Sediment Reduction Act (Stormwater Act)[9] as a basis for granting summary judgment. We agree.

"The [Stormwater Act] requires a person who intends to engage in a land disturbing activity to submit a stormwater management and sediment control plan to the appropriate agency and obtain a permit before engaging in the activity, unless an exemption applies." *Responsible Econ. Dev. v. S.C. Dep't of Health & Env't Control*, 371 S.C. 547, 551, 641 S.E.2d 425, 427 (2007) (footnotes omitted).

In its order, the circuit court found, as a basis for immunity, that "the [Stormwater Act] does not impose any liability upon the state or government entity for acting or failing to act under the [Stormwater Act]." This section read in full states

> [n]othing contained in this chapter and no action or failure to act under this chapter may be construed:
>
> (1) to impose any liability on the State, department, districts, local governments, or other agencies, officers, or employees thereof for the recovery of damages caused by such action or failure to act; or
>
> (2) to relieve the person engaged in the land disturbing activity of the duties, obligations, responsibilities, or liabilities arising from or incident to the operations associated with the land disturbing activity.

§ 48-14-160. Section 48-14-160(1) is not a catch-all provision that provides unchecked immunity to governmental entities once a Stormwater Act permit has

---

[9] S.C. Code Ann. §§ 48-14-10 to -170 (Supp. 2022).

been obtained.  Instead, a comprehensive reading of the provision reveals the opposite—that the Stormwater Act neither imposes nor relieves liability for actions or failures to act.  Therefore, because the circuit court relied upon the Stormwater Act in granting summary judgment, it was in error as a matter of law.  *See* Rule 56(c) ("[Summary] judgment sought shall be rendered forthwith if . . . the moving party is entitled to a judgment as a matter of law.").

## CONCLUSION

Based on the foregoing, we find that a genuine issue of material fact existed as to whether SCDOT's conduct amounted to an affirmative, positive, aggressive act for the purposes of inverse condemnation, and as a result, we reverse and remand this issue for further proceedings.  Additionally, we find that granting summary judgment based on the Stormwater Act was in error as a matter of law; therefore, we reverse summary judgment on this issue.  Lastly, we affirm the circuit court's decision to grant summary judgment on SCDOT's liability under the TCA.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WILLIAMS, C.J., and VERDIN, J., concur.**